**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **WARNER RECORDS INC., ATLANTIC RECORDING CORPORATION, ATLANTIC RECORDS GROUP LLC, BAD BOY RECORDS LLC, BIG BEAT RECORDS INC., ELEKTRA ENTERTAINMENT GROUP INC., FUELED BY RAMEN LLC, LAVA RECORDS LLC, MAVERICK RECORDING COMPANY, NONESUCH RECORDS INC., RHINO ENTERTAINMENT COMPANY, RHINO ENTERTAINMENT LLC, ROADRUNNER RECORDS, INC., RYKODISC, INC., WARNER MUSIC INC., WARNER MUSIC INTERNATIONAL SERVICES LIMITED, WARNER MUSIC NASHVILLE LLC, WARNER RECORDS/QRI VENTURE, INC., SONY MUSIC ENTERTAINMENT, ARISTA MUSIC, ARISTA RECORDS, LLC, LAFACE RECORDS, LLC, SONY MUSIC ENTERTAINMENT US LATIN LLC, ULTRA RECORDS, LLC, VOLCANO ENTERTAINMENT III, LLC, ZOMBA RECORDING LLC, WARNER CHAPPELL MUSIC, INC., COTILLION MUSIC, INC., GENE AUTRY'S WESTERN MUSIC PUBLISHING CO., GOLDEN WEST MELODIES, INC., INTERSONG U.S.A., INC., UNICHAPPELL MUSIC INC., W CHAPPELL MUSIC CORP., W.C.M. MUSIC CORP., WARNER-TAMERLANE PUBLISHING CORP., SONY MUSIC PUBLISHING (US) LLC, COLGEMS-EMI MUSIC INC., EMI APRIL MUSIC INC., EMI BLACKWOOD MUSIC INC., EMI CONSORTIUM MUSIC PUBLISHING, INC., EMI CONSORTIUM SONGS, INC., EMI ENTERTAINMENT WORLD INC., EMI GOLD HORIZON MUSIC CORP., EMI MILLER** | Case No. 2:23-cv-576

<br><br>

ORIGINAL COMPLAINT

<br><br>

JURY TRIAL DEMANDED |

**CATALOG INC., EMI MILLS MUSIC INC.,
EMI ROBBINS CATALOG INC., EMI U
CATALOG INC., EMI UNART CATALOG INC.,
FAMOUS MUSIC LLC, JOBETE MUSIC CO.,
INC., SCREEN GEMS-EMI MUSIC INC.,
STONE AGATE MUSIC, AND STONE
DIAMOND MUSIC CORP.,**

      Plaintiffs,

v.

**ALTICE USA, INC. and CSC HOLDINGS, LLC,**

      Defendants.

## PLAINTIFFS' ORIGINAL COMPLAINT

Warner Records Inc., Atlantic Recording Corporation, Atlantic Records Group LLC, Bad

Boy Records LLC, Big Beat Records Inc., Elektra Entertainment Group Inc., Fueled by Ramen

LLC, Lava Records LLC, Maverick Recording Company, Nonesuch Records Inc., Rhino

Entertainment Company, Rhino Entertainment LLC, Roadrunner Records, Inc., Rykodisc, Inc.,

Warner Music Inc., Warner Music International Services Limited, Warner Music Nashville LLC,

Warner Records/QRI Venture, Inc., Sony Music Entertainment, Arista Music, Arista Records,

LLC, LaFace Records, LLC, Sony Music Entertainment US Latin LLC, Ultra Records, LLC,

Volcano Entertainment III, LLC, Zomba Recording LLC, Warner Chappell Music, Inc., Cotillion

Music, Inc., Gene Autry's Western Music Publishing Co., Golden West Melodies, Inc., Intersong

U.S.A., Inc., Unichappell Music Inc., W Chappell Music Corp., W.C.M. Music Corp., Warner-

Tamerlane Publishing Corp., Sony Music Publishing (US) LLC, Colgems-EMI Music Inc., EMI

April Music Inc., EMI Blackwood Music Inc., EMI Consortium Music Publishing, Inc., EMI

Consortium Songs, Inc., EMI Entertainment World Inc., EMI Gold Horizon Music Corp., EMI

2

Miller Catalog Inc., EMI Mills Music Inc., EMI Robbins Catalog Inc., EMI U Catalog Inc., EMI UNART Catalog Inc., Famous Music LLC, Jobete Music Co., Inc., Screen Gems-EMI Music Inc., Stone Agate Music, and Stone Diamond Music Corp. (collectively, "Plaintiffs"), for their Complaint against defendants Altice USA, Inc. and CSC Holdings, LLC (collectively, "Altice" or "Defendants"), allege, on personal knowledge as to matters relating to themselves and on information and belief as to all other matters, as follows:

## INTRODUCTION

1.      Plaintiffs bring this action for contributory and vicarious copyright infringement against Altice, a company that has knowingly contributed to, and reaped substantial profits from, massive copyright infringement committed by thousands of its subscribers.  Despite receiving tens of thousands of notices from Plaintiffs that detailed the illegal activity of its subscribers and despite its clear legal obligation to address the widespread, illegal downloading of copyrighted works on its Internet service, Altice enabled its subscribers to continue infringing Plaintiffs' copyrights with impunity through the continued provision of its high-speed Internet service to known repeat infringers.

2.      Plaintiffs are record companies that produce, manufacture, distribute, sell, and license commercial sound recordings, and music publishers that acquire, market, promote, publish, and license musical compositions, both in the United States and internationally.  Through their enormous investments of money, time, and exceptional creative efforts, Plaintiffs and the recording artists and songwriters they represent have developed and marketed some of the world's most famous music.  Plaintiffs own and/or control exclusive rights to some of the most popular sound recordings performed by classic artists and contemporary superstars, as well as the copyrights to large catalogs of iconic musical compositions and modern hits.  Their investments

and creative efforts have shaped the musical landscape as we know it, both in the United States and around the world.

3.      Altice is one of the largest Internet service providers ("ISPs") in the country.  It markets and sells high-speed Internet service to consumers nationwide.  Through the provision of those services, Altice contributed to and profited from pervasive copyright infringement committed by its subscribers.  Altice's contribution to its subscribers' infringement is both willful and extensive, and it renders Altice equally liable for that infringement.  Indeed, for years, Altice deliberately refused to take reasonable measures to prevent customers from using its Internet services to infringe on others' copyrights, including Plaintiffs' copyrights—even after Altice was put on notice of particular customers engaging in specific, repeated acts of infringement. Plaintiffs' representatives sent tens of thousands of statutory infringement notices to Altice, in addition to the millions of similar notices Altice received from other copyright holders.  Those notices advised Altice of its subscribers' blatant and systematic use of Altice's Internet service to illegally download, copy, and distribute Plaintiffs' copyrighted music through BitTorrent and other online file-sharing services.  Rather than working with Plaintiffs to curb this massive infringement, Altice did nothing, choosing to prioritize its own profits over its legal obligations.

4.      It is well-established law that a party may not assist someone it knows is engaging in copyright infringement.  Further, when a party has a direct financial interest in the infringing activity, and the right and practical ability to stop or limit it, that party must act.  Ignoring and flouting those basic responsibilities, Altice deliberately turned a blind eye to its subscribers' infringement.  Altice failed to terminate or otherwise take meaningful action against the accounts of repeat infringers of which it was aware.  Despite its professed commitment to taking action against repeat offenders, Altice routinely thumbed its nose at Plaintiffs by continuing to provide

4

service to subscribers it knew to be serially infringing Plaintiffs' copyrighted sound recordings and musical compositions.  In reality, Altice operated its service as an attractive tool and safe haven for infringement.

5.     Altice has derived an obvious and direct financial benefit from its subscribers' infringement.  The unlimited ability to download and distribute Plaintiffs' copyrighted works through Altice's service has served as a draw for Altice to attract, retain, and charge higher fees to subscribers.  By failing to terminate the accounts of specific recidivist infringers known to Altice, Altice obtained a direct financial benefit from its subscribers' continuing infringing activity.  That financial benefit included improper revenue that it would not have received had it appropriately shut down those accounts.  Altice decided not to terminate infringers because it wanted to maintain the revenue generated from the infringing subscribers' accounts.

6.     The infringing activity of Altice's subscribers that is the subject of Plaintiffs' claims, and for which Altice is secondarily liable, occurred *after* Altice received multiple notices of each subscriber's infringing activity.  Specifically, Plaintiffs seek relief for claims that accrued between December 2020 – December 2023 (the "Claim Period") for infringement of works by Altice subscribers after those particular subscribers were identified to Altice in multiple infringement notices.

## NATURE OF THE ACTION

7.     This is a civil action in which Plaintiffs seek damages for copyright infringement under the Copyright Act, 17 U.S.C. § 101, *et seq.*

8.     This Court has original subject matter jurisdiction over Plaintiffs' copyright infringement claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

9.     This Court has personal jurisdiction over Altice pursuant to Tex. Civ. Prac. & Rem. § 17.042.  Altice has continuously and systematically transacted business in Texas and maintained sizeable operations in the state.  Texas is one of Altice's largest markets.  Altice operates in more than twenty locations in this district alone and provides an array of services to customers within the state.  Altice is one of the largest employers in Tyler, Texas, and is in the midst of a $500 million business expansion in Texas.  Additionally, Altice operates at least four retail locations in the Eastern District of Texas, located at: 4949 South Broadway Avenue, Tyler, Texas 75703; 1847 Troup Highway, Suite 300, Green Acres Shopping Center, Tyler, Texas 75701; 220 Linda Drive, Sulphur Springs, Texas 75482; and 25 19th Street Southeast, Paris, Texas 75460.

10.     Altice has engaged in substantial activities purposefully directed at Texas from which Plaintiffs' claims arise, including establishing retail locations selling its Internet and cable services to Texas residents; providing Internet service to nearly 200,000 Texas subscribers in this district, many of whom used Altice's network to directly and repeatedly infringe Plaintiffs' copyrights; continuing to provide Internet service to, and failing to suspend or terminate the accounts of Texas customers, even after receiving multiple notices of their infringing activity; advertising its high-speed Internet service in Texas to serve as a draw for subscribers who sought faster download speeds to facilitate their direct and repeated infringements; and responding and/or failing to respond to repeated notices of copyright infringement regarding infringing subscribers located in the state.

11.     Much of the misconduct complained of herein arises directly from Altice's forum-directed activities—including specific and continuing acts of infringement by specific subscribers using Altice's network; Altice's awareness of those activities; Altice's receipt of and failure to act

in response to Plaintiffs' notices of infringement activity; and Altice's failure to take reasonable measures to terminate repeat infringers.

12.     Many of the acts complained of herein occurred in Texas and in this judicial district. For example, a number of egregious repeat infringers, who are Altice subscribers, reside in and infringed Plaintiffs' rights in Texas and this judicial district using Internet service provided by Altice in this state.  Specifically, an Altice subscriber believed to be located in Tyler, Texas, which is in this district, with IP address 75.110.8.224 at the time of infringement, was caught distributing Plaintiffs' copyrighted works over 75 times between January 2023 and March 2023, and Altice was provided a notice of that ongoing infringement in every one of those instances.  A different Altice subscriber believed to be located in Athens, Texas, which is in this district, with IP address 72.47.188.56, was caught distributing Plaintiffs' copyrighted works over 70 times between August 2021 and April 2023, and Altice was provided a notice of that ongoing infringement in every one of those instances.  Another Altice subscriber believed to be located in Jacksonville, Texas, which is in this district, with IP address 74.197.137.24, was caught distributing Plaintiffs' copyrighted works over 100 times between December 2021 and June 2022 and, again, Altice was provided a notice of that ongoing infringement in every one of those instances.

13.     This Court recently sustained a complaint alleging similar copyright infringement claims involving Altice's continued provision of internet services to specific, known repeat infringers of copyrighted sound recordings and musical compositions.  *BMG Rights Mgmt. (US) LLC v. Altice USA, Inc.*, Civil Action No. 2:22-cv-00471-JRG, Dkt. 44 (E.D. Tex. May 12, 2023).

14.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c), and 1400(a).  A substantial part of the acts of infringement, and other events and omissions complained of herein, occur or have occurred in this district, and this is a district in which Altice resides or may be found.

## PLAINTIFFS AND THEIR COPYRIGHTED MUSIC

15.     Plaintiffs are the copyright owners of, and/or control exclusive rights with respect to, millions of sound recordings and/or musical compositions, including many recorded and written by some of the most prolific and well-known recording artists and songwriters throughout the world.

16.     Warner Records Inc., is a Delaware corporation with its principal place of business in Los Angeles, California.

17.     Plaintiff Atlantic Recording Corporation is a Delaware corporation with its principal place of business in New York, New York.

18.     Plaintiff Atlantic Records Group LLC is a Delaware limited liability company with its principal place of business in New York, New York.

19.     Plaintiff Bad Boy Records LLC is a Delaware limited liability company with its principal place of business in New York, New York.

20.     Plaintiff Big Beat Records Inc. is a Delaware corporation with its principal place of business in New York, New York.

21.     Plaintiff Elektra Entertainment Group Inc. is a Delaware corporation with its principal place of business in New York, New York.

22.     Plaintiff Fueled by Ramen LLC is a Delaware limited liability company with its principal place of business in New York, New York.

23.     Plaintiff Lava Records LLC is a Delaware limited liability company with its principal place of business in New York, New York.

24.     Plaintiff Maverick Recording Company is a California general partnership with its principal place of business in Los Angeles, California.

25.     Plaintiff Nonesuch Records Inc. is a Delaware corporation with its principal place of business in New York, New York.

26.     Plaintiff Rhino Entertainment Company is a Delaware corporation with its principal place of business in New York, New York.

27.     Plaintiff Rhino Entertainment LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.

28.     Plaintiff Roadrunner Records, Inc. is a New York corporation with its principal place of business in New York, New York.

29.     Plaintiff Rykodisc, Inc. is a Minnesota corporation with its principal place of business in Los Angeles, California.

30.     Plaintiff Warner Music Inc. is a Delaware corporation with its principal place of business in New York, New York.

31.     Plaintiff Warner Music International Services Limited is a limited liability company, organized and existing under the laws of England and Wales, with its principal place of business in London, United Kingdom.

32.     Plaintiff Warner Music Nashville LLC is a Tennessee limited liability company with its principal place of business in Nashville, Tennessee.

33.     Plaintiff Warner Records/QRI Venture, Inc. is a Delaware corporation with its principal place of business in Los Angeles, California.

34.     Warner Records Inc., Atlantic Recording Corporation, Atlantic Records Group LLC, Bad Boy Records LLC, Big Beat Records Inc., Elektra Entertainment Group Inc., Fueled by Ramen LLC, Lava Records LLC, Maverick Recording Company, Nonesuch Records Inc., Rhino Entertainment Company, Rhino Entertainment LLC, Roadrunner Records, Inc., Rykodisc, Inc.,

Warner Music Inc., Warner Music International Services Limited, Warner Music Nashville LLC, and Warner Records/QRI Venture, Inc. are referred to collectively herein as the "Warner Music Plaintiffs."

35.     Plaintiff Sony Music Entertainment is a Delaware general partnership, the partners of which are citizens of New York and Delaware.  Sony Music Entertainment's headquarters and principal place of business are located in New York, New York.

36.     Plaintiff Arista Music is a New York partnership with its principal place of business in New York, New York.

37.     Plaintiff Arista Records, LLC is a Delaware limited liability company with its principal place of business in New York, New York.

38.     Plaintiff LaFace Records, LLC is a Delaware limited liability company with its principal place of business in New York, New York.

39.     Plaintiff Sony Music Entertainment US Latin LLC is a Delaware limited liability company with its principal place of business in Coconut Grove, Florida.

40.     Plaintiff Ultra Records, LLC is a Delaware limited liability company with its principal place of business in New York, New York.

41.     Plaintiff Volcano Entertainment III, LLC is a Delaware limited liability company with its principal place of business in New York, New York.

42.     Plaintiff Zomba Recording LLC is a Delaware limited liability company with its principal place of business in New York, New York.

43.     Sony Music Entertainment, Arista Music, Arista Records, LLC, LaFace Records, LLC, Sony Music Entertainment US Latin LLC, Ultra Records, LLC, Volcano Entertainment III,

LLC, and Zomba Recording LLC are referred to collectively herein as the "Sony Music Entertainment Plaintiffs."

44.     The Warner Music Plaintiffs and the Sony Music Entertainment Plaintiffs are referred to herein together as the "Record Company Plaintiffs."  The Record Company Plaintiffs are some of the largest record companies in the world, engaged in the business of producing, manufacturing, marketing, promoting, distributing, selling, and licensing sound recordings in the United States through various media.  They invest substantial money, time, effort, and talent in creating, advertising, promoting, selling, and licensing unique and valuable sound recordings embodying the performances of their recording artists.

45.     Plaintiff Warner Chappell Music, Inc. is a Delaware corporation with its principal place of business in Los Angeles, California that does business as Chappell & Co., Inc. and Warner Geometric Music.

46.     Plaintiff Cotillion Music, Inc. is a Delaware corporation with its principal place of business in Los Angeles, California.

47.     Plaintiff Gene Autry's Western Music Publishing Co. is a California corporation with its principal place of business in Los Angeles, California.

48.     Plaintiff Golden West Melodies, Inc. is a California corporation with its principal place of business in Los Angeles, California.

49.     Plaintiff Intersong U.S.A., Inc. is a Delaware corporation with its principal place of business in Los Angeles, California.

50.     Plaintiff Unichappell Music Inc. is a Delaware corporation with its principal place of business in Los Angeles, California.

51.     Plaintiff W Chappell Music Corp. is a California corporation with its principal place of business in Los Angeles, California that also does business as WC Music Corp.

52.     Plaintiff W.C.M. Music Corp. is a Delaware corporation with its principal place of business in Los Angeles, California.

53.     Plaintiff Warner-Tamerlane Publishing Corp. is a California corporation with its principal place of business in Los Angeles, California.

54.     Warner Chappell Music, Inc., Cotillion Music, Inc., Gene Autry's Western Music Publishing Co., Golden West Melodies, Inc., Intersong U.S.A., Inc., Unichappell Music Inc.,   W Chappell Music Corp., W.C.M. Music Corp., and Warner-Tamerlane Publishing Corp. are referred to collectively herein as the "Warner Chappell Plaintiffs."

55.     Plaintiff Sony Music Publishing (US) LLC is a Delaware limited liability company with its principal place of business in New York, New York.

56.     Plaintiff Colgems-EMI Music Inc. is a Delaware corporation with its principal place of business in New York, New York.

57.     Plaintiff EMI April Music Inc. is a Connecticut corporation with its principal place of business in New York, New York.

58.     Plaintiff EMI Blackwood Music Inc. is a Connecticut corporation with its principal place of business in New York, New York.

59.     Plaintiff EMI Consortium Music Publishing, Inc. is a New York corporation with its principal place of business in New York, New York.

60.     Plaintiff EMI Consortium Songs, Inc. is a New York corporation with its principal place of business in New York, New York.

61.     Plaintiff EMI Entertainment World Inc. is a Delaware corporation with its principal place of business in New York, New York.

62.     Plaintiff EMI Gold Horizon Music Corp. is a New York corporation with its principal place of business in New York, New York.

63.     Plaintiff EMI Miller Catalog Inc. is a New York corporation with its principal place of business in New York, New York.

64.     Plaintiff EMI Mills Music Inc. is a Delaware corporation with its principal place of business in New York, New York.

65.     Plaintiff EMI Robbins Catalog Inc. is a New York corporation with its principal place of business in New York, New York.

66.     Plaintiff EMI U Catalog Inc. is a New York corporation with its principal place of business in New York, New York.

67.     Plaintiff EMI UNART Catalog Inc. is a New York corporation with its principal place of business in New York, New York.

68.     Plaintiff Famous Music LLC is a Delaware limited liability company with its principal place of business in New York, New York.

69.     Plaintiff Jobete Music Co., Inc. is a Michigan corporation with its principal place of business in New York, New York.

70.     Plaintiff Screen Gems-EMI Music Inc. is a Delaware corporation with its principal place of business in New York, New York.

71.     Plaintiff Stone Agate Music is a division of Jobete Music Co., Inc.

72.     Plaintiff Stone Diamond Music Corp. is a Michigan corporation with its principal place of business in New York, New York.

73.     Sony Music Publishing (US) LLC, Colgems-EMI Music Inc., EMI April Music Inc., EMI Blackwood Music Inc., EMI Consortium Music Publishing, Inc., EMI Consortium Songs, Inc., EMI Entertainment World Inc., EMI Gold Horizon Music Corp., EMI Miller Catalog Inc., EMI Mills Music Inc., EMI Robbins Catalog Inc., EMI U Catalog Inc., EMI UNART Catalog Inc., Famous Music LLC, Jobete Music Co., Inc., Screen Gems-EMI Music Inc., Stone Agate Music, and Stone Diamond Music Corp. collectively are referred to herein as the "Sony Music Publishing Plaintiffs."

74.     The Warner Chappell Plaintiffs and the Sony Music Publishing Plaintiffs are referred to herein together as the "Music Publisher Plaintiffs."  The Music Publisher Plaintiffs are leading music publishers engaged in the business of acquiring, marketing, promoting, publishing, and licensing copyrighted musical compositions.  Each invests substantial money, time, effort, and talent to acquire, administer, promote, publish, and license such copyrights, on its own behalf and on behalf of songwriters and others who have assigned exclusive copyright interests to the Music Publisher Plaintiffs.

75.     Plaintiffs own and/or control in whole or in part the copyrights and/or exclusive rights in innumerable popular sound recordings and musical compositions, including during the Claim Period, the sound recordings listed on Exhibit A and the musical compositions listed on Exhibit B, both of which are illustrative and non-exhaustive.  All of the sound recordings and musical compositions listed on Exhibits A and B have been registered with the U.S. Copyright Office.

## ALTICE AND ITS ACTIVITIES

76.     Defendant Altice USA, Inc. is a Delaware corporation with its principal place of business at 1 Court Square West, Queens, New York 11101.

77.     Defendant CSC Holdings, LLC is a Delaware limited liability company with its principal place of business at 1111 Stewart Avenue, Bethpage, New York 11714.

78.     Altice USA, Inc., and CSC Holdings, LLC constitute the fourth-largest broadband company in the United States, providing broadband communications, video, and Internet services to nearly 5 million residential and business customers across 21 states through its Optimum brand. At all pertinent times, Altice's customers, including those in Texas, have paid substantial subscription fees for access to Altice's high-speed Internet network, with Altice offering a tiered pricing structure whereby a subscriber can have even higher downloading speeds for a higher monthly fee.

79.     Altice USA, Inc. was incorporated in September 2015 as a subsidiary of Altice Group.  Since its formation, Altice USA, Inc. has expanded its footprint in the cable and Internet industries, acquiring a number of companies providing Internet services across the United States.

80.     In December 2015, Netherlands-based Altice N.V. acquired a majority stake in Cequel Corporation, owner of Suddenlink Communications ("Suddenlink"), which was then the seventh-largest U.S. cable operator and operated Internet service under the Suddenlink brand name.  In June 2016, Altice N.V. contributed Cequel Corporation to Altice USA, Inc.

81.     In June 2016, Altice USA, Inc. acquired Cablevision Systems Corporation ("Cablevision"), which operated Internet service under the Optimum brand name.  By combining the businesses of Cablevision and Suddenlink, Altice USA, Inc. became the fourth-largest broadband cable operator in the United States.[1]  And it continued to grow by acquiring additional companies and adding new subscribers.

---

[1] In January 2018, Altice USA, Inc. separated from Netherlands-based Altice N.V. in a spin-off transaction.

82.     In July 2020, Altice USA, Inc. acquired Service Electric Cable T.V. of New Jersey, Inc. and, in April 2022, Altice USA, Inc. acquired Morris Broadband, rebranding both companies' Internet services under the Optimum brand name.

83.     In August 2022, Altice rebranded Suddenlink's Internet service under the "Optimum" brand name, as well.

84.     Many of Altice's customers are motivated to subscribe to Altice's service because it allows them to download music and other copyrighted content—including unauthorized content—as efficiently as possible.  Accordingly, in its consumer marketing material, including material directed to Texas customers, Altice has boasted about its high-speed Internet service directly to Internet users who download music.  In one commercial, Altice stated: "You download songs.  With Suddenlink, you can download one hundred albums in the time it takes to download one with our competitor."[2]  Altice has marketed its service to consumers on the basis of its easy ability to download music.

85.     Altice has consistently and actively engaged in sophisticated network and customer management practices to suit its own purposes.  This includes monitoring for, and taking action against, spam and other unwanted activity that might otherwise interfere with its provision of Internet service to its subscribers.  At the same time, including during the Claim Period, Altice has gone out of its way not to take action against subscribers engaging in repeated copyright infringement, at the expense of copyright owners, ultimately forcing Plaintiffs to bring this action.

86.     Altice's failure to take action against subscribers using its network to engage in repeated copyright infringement stood contrary to its own policies.  Indeed, Altice's "Copyright

---

[2] Suddenlink, "Suddenlink 'Download' Commercial," https://www.youtube.com/watch?v=H-gfFVCkbnY (last accessed Dec. 7, 2023).

Infringement Policy" states that subscribers "may not store, distribute or otherwise disseminate any material or content over the Optimum internet service in any manner that constitutes an infringement of third-party intellectual property rights, including but not limited to copyrights."[3] Altice's Copyright Infringement Policy further states that Altice "reserves the right, in its sole discretion, to suspend or terminate, in appropriate circumstances, the Optimum internet service provided to any Subscriber who Optimum reasonably believes to be infringing third-party copyright or other intellectual property rights, including repeat infringers."[4]  Altice's Residential General Terms and Conditions of Service ("Terms of Service") reiterate that subscribers may not use Altice's network to infringe the intellectual property rights of others, including copyright.[5]

87.    At all pertinent times, including during the Claim Period, Altice knew that its subscribers routinely used its networks for illegally downloading and uploading copyrighted works, especially music.  As described below, Plaintiffs repeatedly notified Altice that thousands of its subscribers were actively utilizing its service to infringe Plaintiffs' copyrighted works.  Those notices gave Altice the specific identities of its subscribers engaged in copyright infringement, referred to by their unique Internet Protocol or "IP" addresses.  Altice also received millions of notices from other copyright owners, some of which undoubtedly addressed the same subscribers as Plaintiffs' notices.  Altice thus knew which particular subscribers engaged in repeat infringement and Altice had the right and ability to stop the infringement, including by suspending or terminating the accounts of repeat infringers.  Yet Altice persistently turned a blind eye to the

---

[3] Optimum, "Copyright Infringement Policy," https://www.optimum.com/terms-of-service/Copyright-Policy (last accessed Dec. 7, 2023).

[4] *Id.*

[5] Optimum, "Residential General Terms and Conditions of Service," https://www.optimum.com/terms-of-service/residential (last accessed Dec. 7, 2023).

massive infringement of Plaintiffs' copyrighted works occurring over its network.  Altice condoned the illegal activity because this activity was popular with subscribers and acted as a draw to attract and retain new and existing subscribers.  Altice's customers, in turn, continued using Altice's services to infringe Plaintiffs' copyrighted works.

88.     Altice undoubtedly recognized that if it terminated or otherwise prevented its repeat infringer subscribers from using its service to infringe, or made it less attractive for such use, Altice would enroll fewer new subscribers, lose existing subscribers, and ultimately lose revenue.  For those account holders and subscribers who wanted to download files illegally at faster speeds, Altice provided the means for them to do so in exchange for higher rates.  Indeed, Altice offered "tiered" service plans in which subscribers could pay less for a "lower-tier plan" with limits on the amount of data available monthly and strict limits on upload and download speeds, or alternatively, subscribers could pay more for a "higher-tier" plan which provides unlimited data and greater upload and download speeds.[6]  In other words, the greater the bandwidth its subscribers required for illegally downloading and uploading copyrighted works, the more money Altice made.

### THE GLOBAL PEER-TO-PEER PIRACY PROBLEM

89.     While the digital age has brought many benefits, one notable exception is its facilitation of unprecedented online piracy of music and other copyrighted works.  As the U.S. Supreme Court has recognized, the level of copyright infringement on the Internet is "staggering." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 923 (2005).

90.     Use of peer-to-peer ("P2P") distribution systems has dominated unauthorized downloading and distribution of copyrighted music.  P2P is a generic term used to refer to a

---

[6] While Altice apparently eliminated monthly data limits in some service areas as part of transitioning its Suddenlink service to the Optimum brand name, Altice maintained a tiered pricing structure in which subscribers could pay more for faster speeds.

decentralized network of users whereby each Internet-connected participant (*i.e.*, a "peer" or a "node") can act as both a supplier and consumer of content files.  Early P2P services, such as Napster and KaZaA, have been replaced by even more robust and efficient systems, most notably a protocol called "BitTorrent."  The online piracy committed via BitTorrent is stunning in nature, speed, and scope.  Utilizing a BitTorrent client—essentially a tool that manages the uploading and downloading of files through BitTorrent technology—persons connected to the Internet can locate, access, and download copyrighted content from other peers in the blink of an eye.  They download copyrighted music from other network users, usually total strangers, and end up with complete digital copies of any music they desire—without payment to copyright owners or creators.

91.     BitTorrent is uniquely efficient in the way it facilitates illegal file transfers.  On earlier P2P networks, a user wanting to download a music file would have to locate another Internet-connected peer with the desired file and download the entire file from that peer.  BitTorrent facilitates much faster downloading by breaking each file into pieces, allowing users to download different pieces of content simultaneously from different peers.  At the same time, the system allows users to begin disseminating the copyrighted content before the complete file has finished downloading.  This means that, at any given time, each user connected to the Internet can be both downloading and uploading different pieces of a file from, and to, multiple other users.  Once a user has downloaded all the pieces, the file is automatically reassembled into its complete form and available for playback by the user.  Illegally acquiring copyrighted music in this fashion eliminates the need to obtain it through legitimate channels and obviates paying for it.

92.     BitTorrent has been and continues to be used widely as a vehicle to infringe content online, including during the Claim Period.  As of August 2020, BitTorrent and uTorrent (another

popular torrent client) had been downloaded and installed over 2 billion times.[7]  The network intelligence company Sandvine reported that in 2021, BitTorrent accounted for nearly 10% of the total upstream volume of Internet traffic and nearly 3% of all Internet traffic globally.[8]  And in January 2023, the online reference company DataReportal reported that over 5.15 billion people use the Internet globally.[9]

93.     Internet access is essential for P2P file-sharing, including via BitTorrent.  In other words, to download or upload files via BitTorrent, a person must have an Internet connection.  Faster download and upload speeds enable faster and more efficient copying and distribution of files over BitTorrent and other P2P protocols.  Repeat infringers—including Altice subscribers whom Plaintiffs and other rightsholders observed using BitTorrent and other P2P file-sharing protocols to unlawfully copy and distribute copyrighted content up to hundreds or thousands of times—are drawn to Altice's high-speed Internet service because they can infringe copyright-protected music efficiently, extensively, and repeatedly, without consequence.

## ALTICE'S PROVISION OF ITS INTERNET SERVICE TO KNOWN, REPEAT INFRINGERS

94.     Over the past 25 years, as P2P piracy became widespread, owners of copyrighted music and other works have employed litigation and other means to attempt to curtail the massive theft of their copyrighted works.  Altice has been keenly aware of those efforts as well as the use of its network for P2P piracy.

---

[7] BitTorrent Inc. Blog, "BitTorrent Crosses Historic 2 Billion Installations" (Aug. 11, 2020), *available at* https://www.bittorrent.com/blog/2020/08/11/bittorrent-crosses-historic-2-billion-installations (last accessed Dec. 7, 2023).

[8] Sandvine, "Phenomena: The Global Internet Phenomena Report" (Jan. 2022), *available at* https://www.sandvine.com/global-internet-phenomena-report-2022 (last accessed Dec. 7, 2023).

[9] DataReportal, "Digital 2023: Global Overview Report" (Jan. 26, 2023), https://datareportal.com/reports/digital-2023-global-overview-report (last accessed Dec. 7, 2023).

95.     One such effort, arising out of the general framework of the Digital Millennium Copyright Act, 17 U.S.C. § 512 ("DMCA" or "Section 512"), directs copyright owners and ISPs to work together to reduce copyright infringement online.  Section 512 represents a 'grand bargain' devised by Congress to encourage the development and proliferation of the Internet, while also respecting the intellectual property rights of copyright owners.  Congress intended Section 512 to encourage "service providers and copyright owners to cooperate to detect and deal with copyright infringements" online.[10]

96.     Under the statutory scheme set forth in Section 512, copyright owners bear the burden—financially and logistically—of monitoring the Internet to identify infringement of their works and of notifying ISPs when such infringement is taking place.  While a particular form of notification is not required, the notification must be in writing and contain certain information specified in the statute.  In return, if ISPs want to get the benefit of a statutory safe harbor from monetary damages, ISPs must, among other things, adopt and reasonably implement a policy providing for termination, in appropriate circumstances, of subscribers who are repeat infringers. *See* 17 U.S.C. § 512 (i).  Congress determined that this approach struck the appropriate balance between the need to foster the development of the Internet and promote electronic commerce, and the need to protect the intellectual property of copyright owners.

97.     Following this statutory framework, the Record Company Plaintiffs sent notices to Altice identifying specific instances of subscribers' infringement through P2P activities.  From February 2020 through November 2023, Altice received over 70,000 notices from Plaintiffs, provided under penalty of perjury, detailing specific instances of specific Altice subscribers using P2P protocols on the Altice network to distribute and copy Plaintiffs' copyrighted works.

---

[10] H.R. Rep. 105-551 at 49; S. Rep. 105-190 at 20.

98.     The Record Company Plaintiffs engaged a vendor, OpSec LLC (formerly known as MarkMonitor, Inc.) ("OpSec"), to detect infringements of Plaintiffs' copyrighted works on Altice's network and send infringement notices to Altice.  OpSec is a global leader in brand and content protection, representing clients across a huge range of industries, as well as government agencies and law enforcement.  Using proprietary technology, OpSec's system connected with Altice subscribers using P2P software and confirmed, in each instance, (1) that the subscriber was online, (2) that the subscriber was running a file sharing program, (3) that the subscriber told OpSec that it possessed a confirmed infringing file, identified by a unique "hash" value, and (4) that the subscriber in fact began to distribute the confirmed infringing file, identified by unique "hash" value.  OpSec also verified the file hashes to confirm that Plaintiffs' copyrighted works were being distributed.  Once OpSec had collected this evidence of infringement, OpSec generated and sent a notice of infringement to Altice.

99.     Each infringement notice OpSec sent to Altice identified the unique IP address assigned to each subscriber to Altice's network and the date and time the infringing activity was detected.  Only Altice, as the provider of the technology and system used to infringe, had the information required to match the IP address to a particular subscriber, and to contact that subscriber or terminate that subscriber's service.  Put another way, while Plaintiffs undertook the burden and responsibility of monitoring Altice's network for infringement of Plaintiffs' copyrighted works, only Altice could take action against its subscribers for violating Altice's own Copyright Infringement Policy and Terms of Service by infringing Plaintiffs' works.

100.    Plaintiffs' infringement notices provided Altice with knowledge of clear and unambiguous infringing activity by Altice subscribers—that is, unauthorized downloading and distribution of Plaintiffs' copyrighted works.  Altice's subscribers had no legal basis or

justification for distributing digital copies of Plaintiffs' sound recordings and musical compositions to thousands or millions of strangers over the Internet or for downloading them. Tellingly, to the extent that Altice forwarded Plaintiffs' infringement notices to the infringing subscribers, those subscribers did not contest the claims of infringement by sending counter-notices to Plaintiffs contesting those claims (a process that Altice outlined and made available to its users).

101.    Apart from attesting to the sheer volume of the infringing activity on its network, the infringement notices sent to Altice pointed to specific subscribers who were flagrant and serial infringers.  The infringement notices identified thousands of Altice subscribers engaged in blatant and repeated infringement of Plaintiffs' copyrighted works, including over 100 Altice subscribers in 48 towns and cities within this judicial district, and nearly 1,000 Altice subscribers across the state of Texas.  To cite just a few specific examples within and outside of Texas:

- From December 2020 to May 2021, an Altice subscriber with the IP address 24.46.91.87 was identified in 781 infringement notices, sent on at least 77 separate days.

- From December 2020 to April 2021, an Altice subscriber with the IP address 47.221.111.154, located in Texas, was identified in 502 infringement notices, sent on at least 78 separate days.

- From January 2022 to July 2022, an Altice subscriber with the IP address 24.105.254.151 was identified in 926 infringement notices, sent on at least 194 separate days.

These examples and many others amply illustrate that, rather than terminating repeat infringers—and losing subscription revenues—Altice simply turned a blind eye to the massive infringement on its network.

102.    During all pertinent times, Altice had the full legal right, obligation, and technical ability to prevent or limit the infringements occurring on its network.  Under Altice's Terms of Service and its Copyright Infringement Policy, which its subscribers agreed to as a condition of

using its Internet service, Altice was empowered to exercise its right and ability to suspend or terminate a subscriber's Internet access. Altice could do so for a variety of reasons, including a subscriber's copyright infringement activity. Altice undoubtedly terminated numerous subscribers for non-payment of their monthly fees for Internet and other services.

103. Despite Altice's policies, and receiving over 70,000 infringement notices from Plaintiffs, as well as millions of similar notices from other copyright owners including before the Claim Period, Altice knowingly permitted specifically identified repeat infringers to continue to use its network to infringe. Rather than disconnect the Internet access of blatant repeat infringers to curtail their infringement, Altice knowingly continued to provide these subscribers with the Internet access that enabled them to continue to illegally download and/or distribute Plaintiffs' copyrighted works unabated. Altice's provision of high-speed Internet service to known, repeat infringers materially contributed to these direct infringements.

104. Altice's motivation for refusing to terminate or suspend the accounts of blatant infringing subscribers is simple: Altice valued corporate profits over its legal responsibilities. Altice is paid monthly fees directly by repeat infringing subscribers. Altice is paid more when subscribers need higher data speeds, which repeat infringers often do given the amount of data used by BitTorrent and other P2P protocols. Altice did not want to lose subscriber revenue by terminating accounts of infringing subscribers. Retaining infringing subscribers provided a direct financial benefit to Altice. Nor did Altice want to risk the possibility that account terminations would make its service less attractive to other existing or prospective customers. Moreover, Altice was simply disinterested in devoting sufficient resources to tracking repeat infringers, responding to infringement notices, and terminating accounts in appropriate circumstances. Considering only its pecuniary gain, Altice ignored and turned a blind eye to flagrant, repeated violations by known

24

specific subscribers using its service to infringe, thus facilitating and multiplying the harm to Plaintiffs.

105.    Altice's failure to take meaningful action against its infringing subscribers drew subscribers to purchase Altice's services, so that the subscribers could then use those services to infringe Plaintiffs' (and others') copyrights.  Infringing subscribers were drawn to Altice's services both because of its lax policing of copyright infringement and faster internet speeds that facilitated the use of P2P protocols for those willing to pay more.  Altice fostered a safe haven for infringement in light of its lax policies and thus encouraged its subscribers to infringe.  The specific infringing subscribers identified in Plaintiffs' notices, including the particularly egregious infringers identified above, knew that Altice would not terminate their accounts despite receiving multiple notices identifying them as infringers, and they remained Altice subscribers so that they could continue illegally downloading copyrighted works.

106.    Despite Altice's stated policies and despite receiving tens of thousands of infringement notices concerning Plaintiffs' works, not to mention the millions of similar notices regarding other copyright owners that Altice received, Altice knowingly permitted repeat infringers to continue to use its services to infringe.

107.    In short, Altice provided high-speed internet service to repeat infringers—individuals (identified by IP address) known to Altice to have repeatedly used Altice's network to infringe Plaintiffs' and other rightsholders' copyrights—in blatant disregard of Altice's own public-facing end-user policies, which prohibit subscribers from using Altice's network to infringe the copyrights of others.  Once Altice received Plaintiffs' (and other rightsholders') infringement notices regarding a subscriber with a particular IP address, Altice *knew* that its network was being used for unlawful purposes, and it had a responsibility to act, both in accordance with its own

policies and federal law.  If Altice had terminated the known repeat infringers identified by Plaintiffs, Altice could have prevented further infringement.  Indeed, Congress intended that the DMCA require ISPs to alert their subscribers that, for "those who repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others[,] . . . there is a realistic threat of losing that access."[11]  Altice has refused to fulfill its obligations under the DMCA, choosing instead to contribute to, facilitate, and profit from the repeated infringements of its subscribers.

108.    The consequences of Altice's support of and profit from infringement are obvious and stark.  When Altice's subscribers use Altice's network to obtain infringing copies of Plaintiffs' copyrighted works illegally, that activity undercuts the legitimate music market, depriving Plaintiffs and those recording artists and songwriters whose works they sell and license of the compensation to which they are entitled.  Without such compensation, Plaintiffs, and the recording artists and songwriters they represent, have fewer resources available to invest in the further creation and distribution of music.

## CLAIMS FOR RELIEF

### Count I – Contributory Copyright Infringement

109.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 108 as if fully set forth herein.

110.    Altice and its subscribers have no authorization, permission, license, or consent to exploit Plaintiffs' copyrighted sound recordings or musical compositions.

111.    Altice's subscribers, using Internet access and services provided by Altice, have unlawfully reproduced and distributed via BitTorrent, or other P2P networks, thousands of sound

---

[11] S. Rep. 105-190 at 52; H.R. Rep. 105-551 at 61.

recordings and musical compositions of which Plaintiffs are a legal or beneficial copyright owner or exclusive licensee.  The copyrighted works infringed by Altice's subscribers, which have been registered with the U.S. Copyright Office, include those listed on Exhibits A and B, and many others.  The foregoing activity constitutes direct infringement in violation of 17 U.S.C. §§ 106 and 501, *et seq.*

112.   Altice is liable as a contributory copyright infringer for the direct infringements described above.  Through Plaintiffs' infringement notices and other means, Altice had knowledge that its network was being used to infringe Plaintiffs' copyrighted works on a massive scale, and also knew of specific subscribers engaged in such repeated and flagrant infringement of specific copyrighted works.  Nevertheless, Altice facilitated, encouraged, and materially contributed to such infringement by continuing to provide its network and the facilities necessary for its subscribers to commit repeated infringements.  Altice had the means to withhold that assistance upon learning of specific infringing activity by specific users but failed to do so.

113.   By purposefully ignoring and turning a blind eye to its subscribers' flagrant and repeated infringements, Altice knowingly caused and materially contributed to the unlawful reproduction and distribution of Plaintiffs' copyrighted works, including but not limited to those listed on Exhibits A and B, in violation of Plaintiffs' exclusive rights under the copyright laws of the United States.

114.   Each infringement of Plaintiffs' copyrighted sound recordings and musical compositions constitutes a separate and distinct act of infringement.  Plaintiffs' claims of infringement against Altice are timely because they all fall within the Copyright Act's statute of limitations set forth at 17 U.S.C. § 507.

115.    The foregoing acts of infringement by Altice have been willful, intentional, and purposeful, in disregard of Plaintiffs' rights.  Indeed, the sound recordings on Exhibit A and the musical compositions on Exhibit B represent works infringed by Altice's subscribers after those particular subscribers were identified to Altice in multiple infringement notices.

116.    As a direct and proximate result of Altice's willful infringement of Plaintiffs' copyrights, Plaintiffs are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 with respect to each work infringed.  Alternatively, at Plaintiffs' election, Plaintiffs shall be entitled to their actual damages pursuant to 17 U.S.C. § 504(b), including Altice's profits from the infringements, as will be proven at trial.

117.    Plaintiffs are also entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

### Count II – Vicarious Copyright Infringement

118.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 117 as if fully set forth herein.

119.    Altice and its subscribers have no authorization, permission, license, or consent to exploit Plaintiffs' copyrighted sound recordings or musical compositions.

120.    Altice's subscribers, using Internet access and services provided by Altice, have unlawfully reproduced and distributed via BitTorrent or other P2P services thousands of sound recordings and musical compositions for which Plaintiffs are a legal or beneficial copyright owner or exclusive licensee.  The copyrighted works infringed by Altice's subscribers, which have been registered with the U.S. Copyright Office, include those listed on Exhibits A and B, and many others.  The foregoing activity constitutes direct infringement in violation of 17 U.S.C. §§ 106 and 501, *et seq.*

121.    Altice is liable as a vicarious copyright infringer for the direct infringements described above.  Altice has the legal and practical right and ability to supervise and control the infringing activities that occur through the use of its network, including through the enforcement of its Terms of Service and its Copyright Infringement Policy, and at all relevant times, including during the Claim Period, has had a financial interest in, and derived direct financial benefit from, the infringing use of its network.  Altice has derived an obvious and direct financial benefit from its customers' infringement.  The ability to use Altice's high-speed Internet network and facilities to illegally download Plaintiffs' copyrighted works has served to draw, maintain, and generate higher fees from paying subscribers to Altice's service.  Among other financial benefits, by failing to terminate the accounts of specific repeat infringers known to Altice, Altice has profited from illicit revenue through user subscription fees that it would not have otherwise received from repeat infringers, as well as new subscribers drawn to Altice's services for the purpose of illegally downloading copyrighted works.  The specific infringing subscribers identified in Plaintiffs' notices, including the particularly egregious infringers identified herein, knew Altice would not terminate their accounts despite receiving multiple notices identifying them as infringers, and they remained Altice subscribers to continue illegally downloading copyrighted works.

122.    Altice is vicariously liable for the unlawful reproduction and distribution of Plaintiffs' copyrighted works, including but not limited to those listed on Exhibits A and B, in violation of Plaintiffs' exclusive rights under the copyright laws of the United States.

123.    Each infringement of Plaintiffs' copyrighted sound recordings and musical compositions constitutes a separate and distinct act of infringement.  Plaintiffs' claims of infringement against Altice are timely because they all fall within the Copyright Act's statute of limitations set forth at 17 U.S.C. § 507.

124.    The foregoing acts of infringement by Altice have been willful, intentional, and purposeful, in disregard of Plaintiffs' rights.  Indeed, the sound recordings on Exhibit A and the musical compositions on Exhibit B are works infringed by Altice's subscribers *after* those particular subscribers were identified to Altice in multiple prior infringement notices.

125.    As a direct and proximate result of Altice's willful infringement of Plaintiffs' copyrights, Plaintiffs are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 with respect to each work infringed.  Alternatively, at Plaintiffs' election, Plaintiffs shall be entitled to their actual damages pursuant to 17 U.S.C. § 504(b), including Altice's profits from the infringements, as will be proven at trial.

126.    Plaintiffs are also entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment from this Court against Altice as follows:

a.  For a declaration that Altice willfully infringed Plaintiffs' copyrights;

b.  For statutory damages pursuant to 17 U.S.C. § 504(c), in an amount up to the maximum provided by law, arising from Altice's willful violations of Plaintiffs' rights under the U.S. Copyright Act or, in the alternative, at Plaintiffs' election, Plaintiffs' actual damages pursuant to 17 U.S.C. § 504(b), including Altice's profits from infringement, in an amount to be proven at trial;

c.  For an award of Plaintiffs' costs in this action, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505;

d.  For pre-judgment and post-judgment interest at the applicable rate on any monetary award made part of the judgment against Altice; and

30

    e.   For such other and further relief as the Court deems proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury of all issues that are so triable.

Dated:  December 7, 2023                Respectfully submitted,

*/s/  Matthew J. Oppenheim w/ permission*
*William E. Davis, III*
Matthew J. Oppenheim
Jeffrey M. Gould
Keith Howell
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW, 5th Floor
Washington, DC 20016
Telephone: (202) 621-9027
matt@oandzlaw.com
jeff@oandzlaw.com
khowell@oandzlaw.com

Alexander Kaplan
Carly K. Rothman
Lauren Bergelson
OPPENHEIM + ZEBRAK, LLP
461 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
alex@oandzlaw.com
carly@oandzlaw.com
lbergelson@oandzlaw.com

William E. Davis, III
Texas State Bar No. 24047416
bdavis@davisfirm.com
**THE DAVIS FIRM, PC**
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Telephone: (903) 230-9090
Facsimile:  (903) 230-9661

***Attorneys for Plaintiffs***