# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| WARNER RECORDS, INC. *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> ALTICE USA, INC. AND CSC HOLDINGS, LLC, <br><br> Defendants. | CIVIL ACTION NO. 2:23-cv-00576-JRG-RSP <br><br> JURY TRIAL DEMANDED <br><br> ORAL ARGUMENT REQUESTED |

## DEFENDANTS' MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

I.      Introduction And Statement Of The Issues ........................................................... 1

II.     Allegations In The Complaint ................................................................................ 3

    A.      Altice provides internet service to users. .................................................... 3

    B.      Plaintiffs send Altice notices of alleged user infringement. ...................... 4

    C.      Plaintiffs accuse Altice of secondary infringement. ................................... 5

III.    Legal Standard. ...................................................................................................... 6

IV.     Plaintiffs Fail To Adequately Allege Direct Infringement As Required For
    A Secondary Infringement Claim. .......................................................................... 6

V.      Plaintiffs Fail To State A Contributory Liability Claim. ....................................... 9

    A.      Plaintiffs do not adequately allege culpable conduct ............................... 10

        1.      Plaintiffs fail to plead a culpable material contribution to
        infringement. ................................................................................. 10

        2.      Plaintiffs' threadbare recital of inducement is insufficient ......... 16

    B.      Plaintiffs do not adequately allege knowledge. ....................................... 16

VI.     Plaintiffs Fail To State A Vicarious Liability Claim. .......................................... 20

    A.      Plaintiffs do not adequately allege that Altice has the right and
    ability to supervise and control user infringement ................................... 21

    B.      Plaintiffs do not adequately allege that Altice has a direct financial
    interest in infringement. ............................................................................ 24

CONCLUSION ................................................................................................................ 29

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001)........................................................................22, 23

*Alcatel USA, Inc. v. DGI Techs., Inc.*,
166 F.3d 772 (5th Cir. 1999) ........................................................................11, 13

*Allen v. Walmart Stores, LLC*,
907 F.3d 170 (5th Cir. 2018) ...............................................................................6

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...............................................................4, 6, 16, 26, 27

*Atl. Recording Co. v. Howell*,
554 F. Supp. 2d 976 (D. Ariz. 2008) ..................................................................8

*Bell. Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...............................................................................................6

*BMG Rights Mgmt. (US) LLC v. Altice USA, Inc.*,
2023 WL 3436089 (E.D. Tex. May 12, 2023)...............................11, 13, 15, 22, 28

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
199 F. Supp. 3d 958 (E.D. Va. 2016) ................................................................11

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
881 F.3d 293 (4th Cir. 2018) ........................................................10, 11, 17, 18

*BWP Media USA, Inc. v. T&S Software Assocs., Inc.*,
852 F.3d 436 (5th Cir. 2017) ..............................................................................24

*Canada Hockey, LLC v. Texas A&M Univ. Athletic Dep't*,
No. 20-20503, 2022 WL 445172 (5th Cir. Feb. 14, 2022) ....................................20

*Cooper v. Harvey*,
108 F. Supp. 3d 463 (N.D. Tex. 2015) ...............................................................8

*CoStar Grp. v. LoopNet, Inc.*,
373 F.3d 544 (4th Cir. 2004) ........................................................................15, 24

*ECIMOS, LLC v. Carrier Corp.*,
971 F.3d 616 (6th Cir. 2020) ................................................................................8

*Ellison v. Robertson*,
    357 F.3d 1072 (9th Cir. 2004) ...................................................................25, 26

*Erickson Prods., Inc. v. Kast*,
    921 F.3d 822 (9th Cir. 2019) ...............................................................................28

*Flava Works, Inc. v. Gunter*,
    689 F.3d 754 (7th Cir. 2012) ...............................................................................10

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
    76 F.3d 259 (9th Cir. 1996) ...........................................................21, 22, 23, 28

*Football Ass'n Premier League Ltd. v. YouTube, Inc.*,
    297 F.R.D. 64 (S.D.N.Y. 2013) ..........................................................................18

*Gilmour, Tr. for Grantor Trusts of Victory Med. Ctr. Craig Ranch, LP v. Blue Cross & Blue Shield of Alabama*,
    No. 19-CV-160-SDJ, 2021 WL 1196272 (E.D. Tex. Mar. 30, 2021) ....................17

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005).............................................1, 2, 10, 11, 12, 14, 16, 20, 24, 25

*Music Force, LLC v. Sony Music Holdings Inc.*,
    No. CV 19-6430, 2020 WL 5733258 (C.D. Cal. Aug. 12, 2020)............................23

*Nat'l Car Rental Sys., Inc. v. Comp. Assocs. Int'l, Inc.*,
    991 F.2d 426 (8th Cir. 1993) .................................................................................8

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) .......................................................................15, 23

*Perfect 10, Inc. v. Giganews, Inc.*,
    847 F.3d 657 (9th Cir. 2017) ...............................................................................26

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
    494 F.3d 788 (9th Cir. 2007) ......................................................................20, 21, 23

*Routt v. Amazon.com, Inc.*,
    584 F. App'x 713 (9th Cir. 2014) ........................................................................23

*Shapiro, Bernstein & Co. v. H.L. Green Co.*,
    316 F.2d 304 (2d Cir. 1963)........................................................................20, 21, 22

*Schneider v. YouTube, LLC*,
    -- F. Supp. 3d. --, 2023 WL 3605981 (N.D. Cal. 2023)........................................18

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984).................................................................................1, 2, 6, 10, 14

*Twitter, Inc. v. Taamneh*,
  598 U.S. 471 (2023)..............................................1, 2, 3, 10, 12, 13, 14, 15, 16, 17, 28

*UMG Recordings, Inc. v. Bright House Networks, LLC*,
  No. 19-cv-710, 2020 WL 3957675 (M.D. Fla. July 8, 2020) .............................................27, 28

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*,
  384 F. Supp. 3d 743 (W.D. Tex. 2019)................................................7, 11, 13, 15

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*,
  No. 17-CV-365, 2018 WL 1096871 (W.D. Tex. Feb. 28, 2018).............................................27

*UMG Recordings, Inc. v. RCN Telecom Servs., LLC*,
  19-17272, 2020 WL 5204067 (D.N.J. Aug. 31, 2020) .........................................11

*VHT, Inc. v. Zillow Grp.*,
  918 F.3d 723 (9th Cir. 2019) .............................................22, 23

**Statutes**

17 U.S.C. § 106 .............................................................................7

17 U.S.C. § 512(a) ..........................................................................5

17 U.S.C. § 512(c) ..........................................................................5

17 U.S.C § 512(h) ...........................................................................5

17 U.S.C. § 512(*l*) .......................................................................5, 15

18 U.S.C. § 2333(a) .......................................................................11

35 U.S.C. § 271(c) ........................................................................11

**Rules**

Fed. R. Civ. P. 8 ........................................................................17, 19

Fed. R. Civ. P. 10(b) .....................................................................17

Fed. R. Civ. P. 12(b)(6).................................................................1, 6

**Other Authorities**

Restatement (Second) of Torts § 8A ...................................................13

Restatement (Second) of Torts § 876.................................................14

Defendants Altice and CSC Holdings, LLC (collectively, "Altice") respectfully move to dismiss Plaintiffs' Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).

## I.    Introduction And Statement Of The Issues.

For the past several years, the music industry has sought to install internet service providers ("ISPs") as the internet's copyright police. Their basic theory is that if an ISP (like Altice) receives allegations that someone has used a home or business internet connection to exchange infringing music files, the ISP must thwart any potential future infringement by throwing the entire home or business off of the internet, or pay massive damages. It is a startling notion. Holding a passive infrastructure provider liable for bad acts committed over its wires flouts traditional limits on secondary liability—limits that fully apply to copyright claims per *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), and *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005). But some district courts, including this District in another case against Altice, have allowed the labels' theory to survive the motion to dismiss stage. So the labels bring another complaint seeking another astronomical payday.

But something has changed since those prior decisions were issued: the Supreme Court has unanimously rejected the labels' theory. Last term, in *Twitter, Inc. v. Taamneh*, the Court barred an attempt to hold online social media platforms liable for aiding and abetting the misdeeds of users. 598 U.S. 471 (2023). Like here, the defendants in *Twitter* provided only "infrastructure" that is "generally available to the internet-using public with … no front-end screening." *Id.* at 498-99. And like here, the plaintiffs claimed the defendants "knew that wrongdoers were using its services" but "failed to stop them" by terminating service. *Id.* at 503 (cleaned up). The Supreme Court rejected that theory, and did so on the basis of the same "fundamental" limits on secondary liability at issue in *Sony* and *Grokster*. Together, *Twitter*, *Sony*, and *Grokster* establish that a defendant's continued provision of infrastructure to a known

1

tortfeasor is no basis for liability unless the defendant "consciously, voluntarily, and culpably participat[ed] in or support[ed] the relevant wrongdoing." *Id.* at 505. This dooms Plaintiffs' case.

*First*, even before getting to their secondary liability theories, Plaintiffs' claims fail because the Complaint does not adequately allege instances of direct infringement—a necessary predicate for both contributory and vicarious liability. The Complaint contains no factual allegations of alleged instances of infringing reproduction (i.e., downloads) using an Altice internet connection. And its allegations of infringing distribution (i.e., uploads) are legally deficient because they establish at most that Altice users have made infringing works available to others, not that those users actually *disseminated* works, as the law requires. *Infra* § IV.

*Second*, Plaintiffs' contributory infringement claims are foreclosed by *Sony*, *Grokster*, and *Twitter*. Plaintiffs sing the same old tune in their Complaint, asserting that Altice is liable under an aiding-and-abetting theory for "continued provision of its high-speed Internet service to known repeat infringers." Compl. ¶ 1. But *Sony* and *Grokster* made clear decades ago that such liability is appropriate only for "culpable expression and conduct." *Grokster*, 545 U.S. at 934, 936-37. And *Twitter* holds that merely continuing to provide generally available internet services is not the sort of "truly culpable conduct" that gives rise to aiding-and-abetting liability, notwithstanding knowledge of possible future misuse. 598 U.S. at 488-89. In any event, Plaintiffs' threadbare allegations as to Altice's purported knowledge are legally inadequate, too, resting on the implausible notion that if any internet connection was allegedly used more than once to infringe—at *any time*—Altice knows that the connection will be so used again, and must immediately terminate it. *Infra* § V.

*Third*, Plaintiffs' vicarious infringement claims fail. Those claims boil down to the contention that some of Altice's users seemingly like to infringe, and that Altice has the right to

terminate them for doing so. If this were enough, Plaintiffs' approach would render ISPs vicariously responsible for virtually every bad act one of its users does on the internet. That contravenes *Twitter*'s emphatic statement that "generally … internet or cell service providers" do not "incur culpability merely for providing their services to the public writ large," 598 U.S. at 499—just as generally phone companies do not incur liability for scams perpetrated over their lines. It is therefore unsurprising that Plaintiffs fail to state a claim. They cannot establish Altice's ability to supervise and control user activity because Altice cannot monitor users, and does nothing but provide a passive conduit to online locations outside of Altice's control. And Plaintiffs fail to plead a direct financial benefit to Altice from infringement because they do not plausibly allege that Altice would lose subscribers if users could not infringe Plaintiffs' works on Altice's network. *Infra* § VI.

       The Complaint should be dismissed in its entirety.

## II.    Allegations In The Complaint.

### A.    Altice provides internet service to users.

       "Altice is one of the largest Internet service providers ('ISPs') in the country," Compl. ¶ 3, offering broadband internet service to "nearly 5 million residential and business customers" under its "Optimum" brand, Compl. ¶ 78. As relevant to this case, that is all it does—provide internet connections to paying subscribers, which are used by millions of users, from homes and businesses, to do whatever it is on the vast internet they wish to do. According to the Complaint, "thousands" of Altice's millions of users use their internet connections to exchange music files over "peer-to-peer" (or "P2P") networks, uploading or downloading files to and from "strangers" across the globe. Compl. ¶¶ 1, 78, 90. Plaintiffs allege that some of these files are their copyrighted works.

       Altice's Terms of Service prohibit conduct that "infringe[s] … third-party intellectual

3

property rights, including but not limited to copyrights." Compl. ¶ 86 (incorporating by reference Optimum, "Copyright Infringement Policy," http://www.optimum.com/terms-of-service/Copyright-Policy). But Plaintiffs do not allege that Altice does, or could, monitor millions of users' internet activity in real time.

**B.    Plaintiffs send Altice notices of alleged user infringement.**

As the Complaint readily acknowledges, Altice has no obligation to patrol the internet for infringement. Plaintiffs concede that "copyright owners bear the burden—financially and logistically—of monitoring the Internet to identify infringement of their works." Compl. ¶ 96. Plaintiffs do this monitoring through a vendor called OpSec. *Id.* ¶ 98. OpSec's technology allegedly connects to anonymous P2P users on the internet, determines whether a user "possessed" an "infringing file," then confirms that the user "in fact began to distribute the confirmed infringing file." *Id.* When it did so for users with an Altice IP address, OpSec "generated and sent a notice" to Altice. *Id.* The notice "identified the unique IP address" of the subscriber—which could be anything from a Starbucks in Times Square to a college dorm to a single-family home—and "the date and time the infringing activity was detected." *Id.* ¶ 99. According to Plaintiffs, "[o]nce Altice received Plaintiffs' … infringement notices regarding a subscriber with a particular IP address," Altice "had a responsibility to act." *Id.* ¶ 107.

As part of their factual allegations, Plaintiffs claim that their approach to P2P infringement—copyright holder fires automated notices at ISP; ISP is automatically duty-bound "to act"—"aris[es] out of the general framework of the Digital Millennium Copyright Act." *Id.* ¶ 95. As "legal conclusions," however, Plaintiffs' allegations regarding the DMCA's operation need not be accepted as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Insofar as the DMCA is relevant background for Plaintiffs' claims, it differs markedly from Plaintiffs' characterization.

The "statutory scheme" nowhere contemplates that copyright owners will "notify[] *ISPs*

when … infringement is taking place," Compl. ¶ 96 (emphasis added). The DMCA's provisions for "notification of claimed infringement," on their face, do not apply to ISPs (like Altice) that only "provide[] connections" to the internet. *Compare* 17 U.S.C. § 512(a) (limitation on liability for conduit ISPs), *with id.* § 512(c) (limitation on liability for content hosts).

Nor do ISPs incur "obligations under the DMCA" upon receipt of Plaintiffs' non-statutory notices, Compl. ¶ 107. Indeed, as Plaintiffs stintingly acknowledge elsewhere, Compl. ¶ 96, the DMCA is just a series of safe harbors that impose no duties and prescribe no standard of liability. 17 U.S.C. § 512(*l*) (providing that "[t]he failure of a service provider's conduct to qualify for limitation of liability … shall not bear adversely" on copyright liability).

The DMCA also belies Plaintiffs' allegation that "only Altice could take action against its subscribers" for infringement because "[o]nly Altice … had the information required to match the IP addresses" identified by OpSec "to a particular subscriber." Compl. ¶ 99. Section 512(h), titled "Subpoena To Identify Infringer," affords copyright owners court-ordered process "for identification of an alleged infringer," a mechanism that would give Plaintiffs all the "information required" to "take action," Compl. ¶ 99.

### C.    Plaintiffs accuse Altice of secondary infringement.

Instead, Plaintiffs bring this lawsuit. They allege "widespread, illegal downloading of copyrighted works" on Altice's network, and seek to hold Altice liable for an undisclosed number of acts allegedly taking place between December 2020 and December 2023. Compl. ¶¶ 1, 6. They assert claims for contributory and vicarious copyright infringement. Compl. ¶ 1. Plaintiffs seek to hold Altice liable as a willful infringer of 10,733 works, claiming entitlement to $150,000 in statutory damages per work, or $1.6 billion. Compl. ¶ 125; Exhs. A, B.

For their contributory liability theory, Plaintiffs allege that their notices "provided Altice with knowledge of clear and unambiguous infringing activity" by users. Compl. ¶ 100. They

allege that "[r]ather than disconnect the Internet access of blatant repeat infringers," Altice

"continued to provide these subscribers with … Internet access." Compl. ¶ 103.

For vicarious liability, Plaintiffs allege that Altice "has the legal and practical right and

ability to supervise and control the infringing activities that occur through the use of its

network." Compl. ¶ 121. This is because Altice can "suspend[] or terminat[e] the accounts of

repeat infringers" after they have allegedly infringed. Compl. ¶ 87. Plaintiffs also assert that

Altice "derived an obvious and direct financial benefit from its customers' infringement," on the

theory that the "ability to use Altice's high-speed Internet network and facilities … has served to

draw, maintain, and generate higher fees from paying subscribers." Compl. ¶ 121.

## III.    Legal Standard.

To survive a motion under Federal Rule of Civil Procedure 12(b)(6), "a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim [for] relief that is plausible on

its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.*; *see Allen v. Walmart Stores, LLC*, 907 F.3d 170, 177-78 (5th Cir. 2018). While the reviewing

court must view well-pled facts in the light most favorable to the plaintiff, *Allen*, 907 F.3d at

177-78, pleading "labels and conclusions" or a "formulaic recitation of the elements of a cause of

action" does not suffice. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

## IV.    Plaintiffs Fail To Adequately Allege Direct Infringement As Required For A Secondary Infringement Claim.

To plead a claim for secondary copyright liability, a plaintiff must allege the underlying

instances of direct infringement for which it seeks to hold the defendant liable. *Sony*, 464 U.S. at

434 (plaintiff must show "that users … have infringed"). If a complaint does not adequately

allege those acts of direct infringement—reproduction, distribution, and so forth, 17 U.S.C. § 106—it cannot begin to plausibly allege the requisite elements necessary to hold someone else responsible for those acts. The Complaint here fails at the first step. It purports to allege some unidentified number of "reproduc[tions] and distribut[ions]" by some undisclosed number of anonymous individuals at unidentified dates and times. Compl. ¶¶ 111, 120. Yet it provides no non-conclusory factual allegations plausibly establishing the acts of reproduction or distribution for which Plaintiffs seek to hold Altice liable.

Though the Complaint repeatedly claims that Altice users "unlawfully reproduced and distributed" Plaintiffs' works, *e.g.*, Compl. ¶ 111, it fails to adequately allege violations of either the reproduction or distribution rights.

With respect to the reproduction right, the Complaint contains only the generalized labels "illegal downloading" and "reproduction." *E.g.*, Compl. ¶¶ 1, 113, 122. It contains no factual allegations directed towards any such acts. It does not offer examples of such acts. Indeed, it acknowledges that its own system for allegedly detecting such infringements can only detect that someone "began to *distribute*" a file, *id.* ¶ 98 (emphasis added)—that is, upload it to someone else who may be anywhere else on the planet. As one court explained in the summary judgment context, "notices and evidence that … subscribers made copyrighted material available for download by others" are legally insufficient. *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 384 F. Supp. 3d 743, 760 (W.D. Tex. 2019). Rather, Plaintiffs must establish that users "downloaded or otherwise acquired … copyrighted materials through [Altice's] network, as opposed to any other of a number of plausible—including some legal—means." *Id.* That purely legal reasoning applies equally at the motion to dismiss stage. If Plaintiffs cannot even allege with some factual basis that users used an Altice internet connection to unlawfully

reproduce their works, they cannot state a claim.

As for the distribution right, while Plaintiffs' allegations appear more robust, they nevertheless fall short of stating a claim. This is clear from the few examples the Complaint offers of someone at an Altice "IP address" who was allegedly "caught distributing." Compl. ¶ 12 (alleging IP addresses where users "w[ere] caught distributing" 75, 70, and "over 100" times respectively); *see id.* ¶ 101 (alleging three IP addresses identified in 781, 502, and 926 notices of alleged infringement respectively). Beyond the conclusory allegation that someone distributed Plaintiffs' works, the only actual factual allegations supporting this are OpSec notices that Plaintiffs concede were triggered automatically when someone at an IP address "*began* to distribute*" a file, *id.* ¶ 98 (emphasis added).

This is insufficient. "Infringement of [the distribution right] requires an actual dissemination" of "copies." *Nat'l Car Rental Sys., Inc. v. Comp. Assocs. Int'l, Inc.*, 991 F.2d 426, 434 (8th Cir. 1993) (quotation marks omitted, alteration in original); *see Atl. Recording Co. v. Howell*, 554 F. Supp. 2d 976, 982-84 (D. Ariz. 2008) (same); *Cooper v. Harvey*, 108 F. Supp. 3d 463, 473 (N.D. Tex. 2015) (same). Neither the mere availability of a file nor the transmission of some miniscule portion of that file is actionable infringement. At most, partial transmission is the sort of "de minimis" violation that is "so trivial 'as to fall below the quantitative threshold'" necessary to establish a claim. *ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616, 629 (6th Cir. 2020). And for all the Complaint alleges, nothing more than that de minimis transmission of "pieces of a file" ever occurred, Compl. ¶ 91. So while Plaintiffs *say* infringement is "ongoing," Compl. ¶ 12, they plausibly allege nothing of the sort.

To support claims for secondary infringement, Plaintiffs must plausibly allege instances of *actual* infringement that ostensibly occurred using an Altice internet connection. This is

hardly an academic requirement—Plaintiffs are seeking *$150,000* in damages for every work alleged. It may be both convenient and lucrative for Plaintiffs to fudge the definition of infringement, providing a reason to send more notices and try to enhance their windfall. But the Copyright Act is violated not by virtual, general, or conceivable acts of reproduction or distribution—it is infringed only by literal ones. Plaintiffs' failure to plausibly allege such acts requires dismissal of the Complaint. At a minimum, this Court should dismiss any claims purportedly based on Plaintiffs' throw-in allegations of unlawful reproduction, a step that will significantly simplify this case going forward.

## V.     Plaintiffs Fail To State A Contributory Liability Claim.

Even if Plaintiffs did plausibly allege acts of direct infringement, their contributory infringement claims (Count I) should be dismissed as legally insufficient. Though decorated in rhetoric, Plaintiffs' basic theory is that (a) Altice "continued to provide … subscribers with the Internet access that enabled them" to infringe, Compl. ¶ 103, despite (b) "receiv[ing] multiple notices of [those] subscriber[s'] infringing activity," Compl. ¶¶ 6, 112. The theory fails at both steps. Since this District (and every other district court) last confronted Plaintiffs' theory, the Supreme Court has foreclosed aiding-and-abetting liability based on the mere continued provision of internet service. *Infra* § A. And even if the law did, in some circumstances, require an ISP like Altice to take affirmative actions to thwart infringement on its network, the mere generalized allegation of "multiple notices" of alleged infringement comes nowhere close to pleading those circumstances for each of the untold thousands of individualized claims Plaintiffs purport to advance here. *Infra* § B.

### A.    Plaintiffs do not adequately allege culpable conduct.

#### 1.    Plaintiffs fail to plead a culpable material contribution to infringement.

**a.** Secondary copyright liability "emerged from common law principles [that] are well established in the law." *Grokster*, 545 U.S. at 930. For contributory infringement, those principles are aiding-and-abetting liability. *Id.* at 936.[1] And last term, in *Twitter*, a unanimous Supreme Court reaffirmed the "conceptual core that has animated aiding-and-abetting liability for centuries": "truly culpable conduct." 598 U.S. at 489, 493. As *Twitter* explains, culpability requires not just "awareness" of a role in someone else's misconduct. *Id.* at 487, 504. The defendant must also "take some 'affirmative act'" such as "inducing, encouraging, soliciting, or advising the commission of the offense." *Id.* at 490-91.

Well before *Twitter*, the Supreme Court had applied this core requirement of culpability to copyright's version of aiding-and-abetting liability. In *Sony*, where the plaintiffs sought to hold Sony liable for the alleged infringement of Betamax users, the Court rejected "contributory infringement if [a] product is … capable of substantial noninfringing uses." 464 U.S. at 442. It thus "barred secondary liability based on presuming or imputing intent to cause infringement solely from the design or distribution of a product capable of substantial lawful use, which the distributor knows is in fact used for infringement." *Grokster*, 545 U.S. at 933. Twenty years later, *Grokster* reaffirmed that "culpable expression and conduct" is the touchstone. *Id.* at 934, 936-37. Though culpability can sometimes be "imputed," *id.* at 934, it always requires "affirmative steps taken to foster infringement," *id.* at 918-19, 936-37, such as selling an article

---

[1] *See, e.g.*, *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 309 (4th Cir. 2018) (describing "aiding and abetting" as an "analog to contributory infringement"); *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012) (contributory infringer is "in effect … an aider and abettor").

"'good for nothing else' but infringement," *id.* at 932, or taking "active steps … to encourage direct infringement," *id.* at 936 (quotation marks omitted). *Cf.* 35 U.S.C. § 271(c) (liability for contributory patent infringement limited to selling products that are "not a staple article or commodity of commerce suitable for substantial noninfringing use").

    The canonical formulation of contributory copyright infringement reflects these requirements: a defendant is liable only if it, "with knowledge of the infringing activity, induces, causes, or materially contributes to [the] infringing conduct of another." *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 790 (5th Cir. 1999) (quotation marks omitted). But in recent years, after *Grokster*, the music industry plaintiffs have persuaded some district courts to relax that standard in defiance of *Sony* and *Grokster*'s insistence on culpable conduct.[2] Relying on these decisions in another case against Altice in this District, the court held that "culpable intent" is "not" a "mandatory requirement." *BMG Rights Mgmt. (US) LLC v. Altice USA, Inc.*, 2023 WL 3436089, at *12 (E.D. Tex. May 12, 2023) (hereafter *Altice I*). It thus held that mere continued provision of internet service to subscribers can give rise to contributory infringement. *Id.*

    *Twitter* has now reaffirmed the centrality of culpability in the aiding-and-abetting analysis. In that case, the plaintiffs sought to hold social-media platforms, including Twitter and YouTube, liable as aiders-and-abettors for continuing to provide their services to those it knew were using them to aid in the commission of torts—there, acts of terrorism under 18 U.S.C. § 2333(a). The Court held that these allegations failed to state a claim. The Court found that the plaintiffs' allegations of continued provision of internet "infrastructure" "rest[ed] less on

---

[2] *See Grande*, 384 F. Supp. 3d at 767, *currently on appeal*, No. 23-50162 (5th Cir.); *UMG Recordings, Inc. v. RCN Telecom Servs., LLC*, No. 19-17272, 2020 WL 5204067, at *9 (D.N.J. Aug. 31, 2020); *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 199 F. Supp. 3d 958, 979-80 (E.D. Va. 2016), *rev'd in part*, *Cox*, 881 F.3d 293 (4th Cir. 2018).

affirmative misconduct and more on an alleged failure to stop ISIS from using these platforms." 598 U.S. at 499-500. It explicitly rebuked the Ninth Circuit for finding that Twitter's mere knowledge of the tortfeasors' use of its services was sufficient to impose the required culpability. *Id.* at 503-04. And echoing *Sony* and *Grokster*, the Court rejected a theory under which "ordinary merchants could become liable for any misuse of their goods and services." *Id.* at 489. Rather, liability requires a defendant to "consciously, voluntarily, and culpably participate in or support the relevant wrongdoing," *id.* at 505, "as in something that [it] wishes to bring about, that [it] seek by [its] action to make … succeed," *id.* at 490 (quotation marks omitted).

**b.** Despite *Twitter*'s condemnation, Plaintiffs advance the same knowledge-plus-continuing-provision theory of liability they contrived after *Grokster*. Repeatedly, Plaintiffs allege that Altice induced, encouraged, and materially contributed to infringement because it "failed to terminate or otherwise take meaningful action" to *stop* that infringement. Compl. ¶¶ 3, 4, 85; *see id.* ¶¶ 86, 101, 105, 107 (similar). But even before *Twitter*, *Grokster* explained that "a court would be unable to find contributory liability merely based on failure to take affirmative steps to prevent infringement, if the device otherwise was capable of substantial noninfringing uses." 545 U.S. at 939 n.12. *Twitter* not only reaffirms that principle, but applies it to a directly analogous modern context: the continued provision of passive internet services that are "generally available to the internet-using public with little to no front-end screening by defendants." 598 U.S. at 498-99. Just as alleged "failure to stop ISIS from using [its] platforms" was not enough in *Twitter*, *id.* at 500, claims that Altice failed to stop user infringement are not enough here.

Plaintiffs cannot avoid this result by recasting this inaction in more affirmative-sounding terms like "continued provision of its high-speed Internet service." Compl. ¶ 1; *see id.* ¶¶ 3, 4,

103, 107, 112. Some courts accepted this argument before *Twitter*. *See Grande*, 384 F. Supp. 3d at 766-68; *Altice I*, 2023 WL 3436089, at *12-13 (following *Grande*). But *Twitter* reduces it to semantics. Plaintiffs there also alleged that Twitter "ha[d] known that ISIS has used their platforms for years," yet continued to provide "the infrastructure which provides material support to ISIS"—including "'recommendation' algorithms, enabling ISIS" to further its goals. 598 U.S. at 481-82, 499 (quotation marks omitted). Yet *Twitter* held that merely continuing to provide generally-available service is not an affirmative act, regardless of the verb a plaintiff deploys. *Id.* at 489-91, 498-500.

Nor can Plaintiffs solve the absence of any culpable action through amped-up allegations of Altice's alleged knowledge of infringement. *E.g.*, Compl. ¶¶ 3, 87, 112. To be sure, such awareness of a direct infringer's conduct is a *necessary* condition for liability, *Alcatel*, 166 F.3d at 790; *Twitter*, 598 U.S. at 503—though one Plaintiffs also fail to plausibly allege, *infra* § V.B. But knowledge does not equal culpability. The defendants had knowledge of the tortfeasors' conduct in *Twitter*, too, and it was not enough. 598 U.S. at 481.

Again, some district courts before *Twitter* thought knowledge alone could suffice. For example, the court in *Altice I* (following *Grande*) found that if a defendant "knows that consequences are certain or substantially certain to result, and still goes ahead, he is treated by the law as if he … desired that result." 2023 WL 3436089, at *12. The notion was that if an ISP knows someone is likely to infringe using an internet connection, then Altice *culpably intends* that this person infringe if Altice does not *terminate* their internet connection. This does not follow. To support the proposition, *Altice I* relied on Restatement (Second) of Torts § 8A, which addresses only the "intent" of an "actor" who commits an "act." That section does not address the "conscious, voluntary, and culpable" assistance necessary for a *third party* to be liable for

aiding and abetting that actor, *Twitter*, 598 U.S. at 493, which is addressed in § 876 of the Restatement. "[E]lid[ing]" that "fundamental question" by focusing solely on the defendants' knowledge is exactly the mistake the Ninth Circuit made in *Twitter*. *Id.* at 505.

Last, it makes no difference that internet service is "necessary" to engage in direct infringement online, Compl. ¶ 112, whereas the social media platforms in *Twitter* were not necessary to the terrorist acts themselves. An internet connection is "necessary" for *everything* one does on the internet. So is electricity. That the internet is "necessary" to such a vast universe of acts does not enhance an ISP's culpability for any such act—it *attenuates* it.

That is precisely the teaching of *Sony* and *Grokster*. What mattered there was not whether the product or service could be called necessary to certain conduct, but rather what the nature of the product or service could say about the offeror's culpability. Where the product is "'good for nothing else' but infringement," *Grokster*, 545 U.S. at 932, it is fair to infer the defendant intends that use. But where a product has non-infringing uses, a court cannot impute intent based on the allegation that it is "essential" to another's infringement, Compl. ¶ 93, even where the defendant knows of the infringing use. *Grokster*, 545 U.S. at 933. Altice's "arm's length, passive, and largely indifferent" provision of internet infrastructure cannot support an inference of culpable assistance with each user's misdeeds. *Twitter*, 598 U.S. at 500; *see Sony*, 464 U.S. at 442.

**c.** Perhaps recognizing that their usual knowledge-plus-continued-provision theory no longer works, Plaintiffs try two workarounds. Both fail for the same reason: Each depends on the legally incorrect premise that Altice has some independent legal duty to terminate customers upon receipt of an allegation of infringement.

First, as discussed above (at 4-5), Plaintiffs assert that Altice has the "obligation[] under the DMCA" to terminate subscribers upon receipt of Plaintiffs' notices of alleged infringement.

14

Compl. ¶ 107. This appears to be an attempt to plead into *Twitter*'s acknowledgement that inaction *could* be a basis for liability where the defendant had "some independent duty in tort" to act. 598 U.S. at 501. But Plaintiffs' reading of the DMCA is wrong as a matter of law. Section 512 of the DMCA creates "limitations on liability." 17 U.S.C. § 512 (title). It imposes no obligations. *See id.* § 512(*l*) (non-entitlement to a safe harbor does not "bear adversely" with respect to liability); *see CoStar Grp. v. LoopNet, Inc.*, 373 F.3d 544, 552 (4th Cir. 2004).

Second, Plaintiffs allege that "Altice deliberately refused to take reasonable measures"—i.e., terminate or suspend accused infringers—"to prevent customers … using its Internet services to infringe on others' copyright." Compl. ¶ 3; *see id.* ¶¶ 11, 112. These allegations invoke the "simple measures" standard, a Ninth Circuit innovation under which online content hosts can be liable for hosting infringing content if they "can take simple," i.e., "reasonable and feasible," "measures to prevent further damage to copyrighted works, yet continue[] to provide access." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007) (cleaned up). This dubious concept invents a duty to take action where none exists. But neither the Fifth Circuit nor any other has adopted this approach. And not even the Ninth Circuit has applied it to ISPs, which do not host content, cannot simply remove infringing material, and have only the unreasonable option of cutting *everyone* in an entire home or business off of the internet *entirely*. But some district courts have nevertheless extended the simple measures standard to ISPs. *E.g.*, *Grande*, 384 F. Supp. 3d at 768; *Altice I*, 2023 WL 3436089, at *12-13 (following *Grande*).

The simple measures standard contravenes *Twitter*, which rejected liability for not "terminat[ing] customers after discovering that the customers were using the service for illicit ends," 598 U.S. at 501. The Court did not engage in freewheeling creation of new legal duties, or speculate about how "simple" a measure might be. It rejected the argument because the plaintiffs

"identif[ied] no duty that would require" the defendants to terminate users. *Id.*

If a content host's non-termination of a known tortfeasor was not culpable conduct in *Twitter*, an ISP's non-termination of an internet subscriber who allegedly infringed is not culpable conduct either. To hold otherwise would be unfaithful to the logic of common-law aiding-and-abetting liability—adopted in the copyright context by both *Sony* and *Grokster*—and to recent Supreme Court precedent from a directly analogous context. Plaintiffs' material contribution theory should be rejected.

### 2.    Plaintiffs' threadbare recital of inducement is insufficient.

Plaintiffs also fail to plead contributory infringement on an inducement theory. *Grokster* makes clear that inducement requires "active steps … taken to encourage infringement," like "advertising an infringing use or instructing how to engage in any infringing use." 545 U.S. at 936 (cleaned up). Only that sort of encouragement will "overcome[] the law's reluctance to find liability when a defendant merely sells a commercial product suitable for some lawful use." *Id.*

Though Plaintiffs include cursory allegations that Altice "encouraged" infringement, Compl. ¶ 112, and "fostered a safe haven for infringement in light of its lax policies and thus encouraged … subscribers to infringe," *id.* ¶ 105, they include no supporting factual allegations suggesting that Altice did anything like what *Grokster* requires. Indeed, *Twitter* reaffirmed that, absent allegations the defendant "gave [direct infringers] any special treatment or words of encouragement," there is no "culpability merely for providing [its] services to the public writ large." 598 U.S. at 498-99. Plaintiffs' threadbare "recitation[s] of the elements" of an inducement claim are legally insufficient. *Iqbal*, 556 U.S. at 678 (quotation marks omitted).

### B.    Plaintiffs do not adequately allege knowledge.

Independently, Plaintiffs' contributory liability claim should be dismissed because Plaintiffs do not plausibly allege the knowledge element of contributory liability for their

undifferentiated mass of claims. "[A]iding and abetting is inherently a rule of secondary liability for *specific* wrongful acts." *Twitter*, 598 U.S. at 494 (emphasis added). Thus, even pre-*Twitter* cases have demanded that a plaintiff establish the defendant's "know[ledge] of *specific* instances of infringement" before liability can be imposed. *Cox*, 881 F.3d at 311. Plaintiffs utterly fail to allege this element for two reasons. *First*, as a matter of Rule 8's pleading standards, the Complaint does not begin to identify what instances of direct infringement are at issue, let alone apprise Altice of the facts and circumstances that purportedly give rise to knowledge of those acts. And *second*, as a matter of established copyright law, Plaintiffs' attempt to plead knowledge as to every (unidentified) act of infringement in one generalized stroke falls short.

**1.** Though the Complaint includes just two counts, those two counts are an attempt to bulk-plead *thousands* of individualized claims. Plaintiffs allege "Altice received over 70,000 notices from Plaintiffs" concerning infringement by "thousands of its subscribers," Compl. ¶¶ 87, 97, of thousands of works, Compl. Exhs. A, B. But the Complaint never says which of those 70,000 notices form the basis for its claims, nor pleads facts demonstrating Altice's knowledge with respect to those acts or the users who committed them. Instead it simply touts "the sheer volume of the infringing activity on [Altice's] network." Compl. ¶ 101; *see id.* ¶ 107 (on receipt of notice, "Altice knew that its network was being used for unlawful purposes").

Liberal though the Federal Rules' pleading standard may be, it offers no volume discount. *Gilmour, Tr. for Grantor Trusts of Victory Med. Ctr. Craig Ranch, LP v. Blue Cross & Blue Shield of Alabama*, No. 19-CV-160-SDJ, 2021 WL 1196272, at *8 (E.D. Tex. Mar. 30, 2021) ("Certainly, Plaintiffs cannot attain a relaxed pleading standard merely by filing a more voluminous complaint."); *see* Fed. R. Civ. P. 10(b) ("If doing so would promote clarity, each claim founded on a separate transaction or occurrence … must be stated in a separate count.").

17

This is not a class action. And in any event courts have readily rejected attempts to use the class action mechanism to litigate secondary infringement claims because they are inherently "individualized." *Schneider v. YouTube, LLC*, -- F. Supp. 3d. --, 2023 WL 3605981, at *6 (N.D. Cal. 2023) ("It has been said that 'copyright claims are poor candidates for class-action treatment,' and for good reason. Every copyright claim turns 'upon facts which are particular to that single claim of infringement, and separate from all the other claims.' Every copyright claim is also subject to defenses that require their own individualized inquiries." (quoting *Football Ass'n Premier League Ltd. v. YouTube, Inc.*, 297 F.R.D. 64, 65-66 (S.D.N.Y. 2013))).

Simply put, if Plaintiffs wish to join together untold thousands of individual claims in one action—seeking over $1 billion in liability—they are obligated to adequately allege the elements of each claim. Knowledge that "infringement [is] occurring somewhere on [an ISP's] network" is not enough. *Cox*, 881 F.3d at 311 (quotation marks omitted). On the contrary, even under Plaintiffs' own continued-provision theory, they must allege Altice's "knowledge that infringement is *substantially certain* to result from … continued provision of Internet access to *particular customers*." *Id.* (emphasis added). And they must do so with sufficient factual allegations to apprise Altice of the conduct for which Plaintiffs seek to hold it liable, and to enable Altice to test the viability of those claims.

**b.** Plaintiffs' only attempt to satisfy the above requirement is a single, general allegation seemingly designed to establish knowledge across the board as to each of the (unidentified thousands) of direct infringements it asserts. It alleges that "[t]he infringing activity … for which Altice is secondarily liable[] occurred *after* Altice received multiple notices of each subscriber's infringing activity," Compl. ¶ 6, and that the notices "specifically identified repeat infringers," *id.* ¶ 103; *see id.* ¶¶ 87, 101. Plaintiffs' theory of liability is that any time Altice has received

"multiple notices" as to a particular IP address, it automatically had substantial certainty that someone at the IP address would engage in a later infringement, and it is that later "infringing activity … for which Altice is secondarily liable." Compl. ¶ 6.

The theory manages to be both factually ambiguous *and* legally erroneous. What does the word "multiple" mean here—two notices, three, more? The Complaint does not say. And when exactly were these notices sent relative to each other, and relative to the later infringement for which Altice is allegedly liable? Again, the Complaint gives no hint. Without the answers, it is impossible to know what Plaintiffs' theory is—even in general terms.

What is clear, however, is that wherever Plaintiffs are drawing the line, that line embraces factual circumstances that would plainly fail to state a claim if Plaintiff actually pled them (as Rule 8 requires). Suppose, for example, Plaintiffs alleged that OpSec sent one notice of alleged infringement with respect to an IP address in 2017 and another in 2019. That would satisfy Plaintiffs' multiple-notices-at-any-time threshold, supporting (in Plaintiffs' view) a claim based on any infringement occurring any time after that—say, mid-2023. But such a claim is borderline absurd. Two automated notices sent years apart, and years away from the infringement underlying the claim, fall well short of establishing the sort of "substantial certainty" the law requires. Indeed, the Complaint nowhere alleges that "multiple notices" are even *predictive* of future infringing conduct, let alone that they are such a surefire indicator of future infringement that they render it substantially certain. Common sense teaches otherwise. A person who may have used an internet connection to infringe twice might learn that such conduct is wrong, go back to college, sign up for a lawful streaming service, or any number of other things that makes future infringement unlikely.

In any event, it is Plaintiffs' responsibility to plead facts plausibly alleging the required

"substantial certainty." Its failure to do so is fatal. If the claim we describe in the preceding paragraph (or one like it) is indeed in this case, Altice has a right to know and to seek its dismissal. And for all the Complaint discloses, Plaintiffs are advancing *thousands* of such legally deficient claims, amounting to over $1 billion in potential liability. The contributory infringement claims should be dismissed for failing to allege, for any claim, that Altice knew to a certainty that someone would use the same internet connection to engage in the infringement for which Plaintiffs seek to hold Altice liable. *See Canada Hockey, LLC v. Texas A&M Univ. Athletic Dep't*, No. 20-20503, 2022 WL 445172, at *10 (5th Cir. Feb. 14, 2022), *cert. denied*, 143 S. Ct. 118 (2022) (affirming dismissal on pleadings where plaintiff did not allege that defendants knew specific work was an infringed piece of writing).

## VI.    Plaintiffs Fail To State A Vicarious Liability Claim.

Plaintiffs' vicarious liability claims should also be dismissed. Vicarious infringement is rooted in the "principles of respondeat superior." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 802 (9th Cir. 2007). Its hallmark is an "agency" relationship between defendant and infringer, where the latter acts for the former's benefit. *Id.*; *see Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307-08 (2d Cir. 1963). Thus "vicarious liability … allows imposition of liability when the defendant [1] profits directly from the infringement and [2] has a right and ability to supervise the direct infringer." *Grokster*, 545 U.S. at 930 n.9.

Plaintiffs fail in both respects. As to the supervision-and-control element, Plaintiffs allege only that Altice has the power to *terminate* subscribers *after* they have (allegedly) infringed, not supervise or control their conduct. *Infra* § A. And as to the financial-benefit element, Plaintiffs allege at most *indirect* benefits from infringement like consumer demand for high-speed internet plans. *Infra* § B. Imposing liability in these circumstances would swallow long-standing limitations on secondary liability.

A.    **Plaintiffs do not adequately allege that Altice has the right and ability to supervise and control user infringement.**

**1.** The first element of vicarious liability requires that "the defendant … have the right and ability to *supervise* and *control* the infringement, not just affect it." *Visa*, 494 F.3d at 805. Paradigmatic examples include a dance hall proprietor who hires a band that plays infringing music, and a department store owner who takes a cut of his concessionaire's sales of infringing records. *Shapiro*, 316 F.2d at 307-09.

The vicarious infringers in these cases could monitor and "polic[e]" infringing conduct. *Visa*, 494 F.3d at 802-03 & n.13. The department store owner in *Shapiro*, for instance, licensed the infringer to run a phonograph concession, took a cut of the proceeds, and had "the power to police carefully the conduct of its [infringing] concessionaire." 316 F.2d at 306, 308; *see Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262 (9th Cir. 1996) (supervision and control alleged where flea market operator "controlled and patrolled" its premises in a manner "strikingly similar to th[at] in *Shapiro*"). By contrast, courts have long recognized that a landlord generally lacks the control necessary to be vicariously liable for tenants' infringements. *Shapiro*, 316 F.3d at 307-08.

The Complaint does not allege that Altice can "police carefully the conduct" of all of its users. Plaintiffs do not claim that Altice has any control over users' use of BitTorrent or any other P2P protocol. They do not allege that Altice knows when someone is engaging in file sharing; that it can affect any file transfer; or that it can block file transfer traffic. They do not suggest that Altice could monitor what users do in real time, or that it should engage in such dystopian practices. The most Plaintiffs offer is that "Altice has consistently and actively engaged in sophisticated network and customer management practices," like "monitoring for, and taking action against, spam." Compl. ¶ 85. It is unclear what Plaintiffs are even referencing

21

here. They provide no details. But whatever it is, Plaintiffs do not claim that Altice has the technical or practical ability to monitor for, detect, or thwart infringement in real time. *See supra* 3-4 (discussing policy incorporated at Compl. ¶ 86). That is dispositive. *See VHT, Inc. v. Zillow Grp.*, 918 F.3d 723, 746 (9th Cir. 2019) (no supervision and control where defendant lacked "technical ability to screen out or identify" specific infringing content).

**2.** Instead of alleging an actual and practical ability to control infringing conduct, the Complaint asserts that "Altice had the right and ability to stop the infringement" by "terminating the accounts of repeat infringers." Compl. ¶ 87; *see id.* ¶¶ 102, 121 (similar). Plaintiffs thus rely upon what the *Altice I* court approvingly branded the "termination theory of control." 2023 WL 3436089, at *6-8. Some district courts before *Altice I* accepted this theory, *id.* at *8 (citing decisions), which dispenses entirely with the "careful[]" policing, *Shapiro*, 316 F.2d at 308, "control[ling] and patrol[ing]," *Fonovisa*, 76 F.3d at 262, and "pervasive participation," *id.* at 263 (quotation marks omitted), traditionally necessary to impose vicarious liability. Under this view, all that is needed is that an ISP have a bare contractual right to terminate a subscriber's entire internet connection *after* allegedly infringing conduct takes place.

This theory overreads the authorities from which it is drawn. The district courts that have adopted it have relied upon the Ninth Circuit's statement in *A&M Records, Inc. v. Napster, Inc.* that the "ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." 239 F.3d 1004, 1023 (9th Cir. 2001). *A&M Records*, in turn, relied on the Ninth Circuit's *Fonovisa* decision, which noted as part of its analysis that the flea market owner in that case had a "right to terminate" its "vendors for any reason." 76 F.3d at 262.

But both cases also emphasized the defendants' *practical* ability to police "premises" that

were entirely within the defendants' dominion, and that were actively hosting infringers or infringing content. In *A&M Records*, Napster—which operated its own centralized "network servers" to facilitate P2P file sharing, 239 F.3d at 1011—"ha[d] the ability to locate infringing material listed on its search indices," *id.* at 1024. And *Fonovisa* involved a flea market owner that "controlled and patrolled" its premises. 76 F.3d at 262. So those cases do not support some broad contractual termination theory of control. They are cases where the defendant had "*both* a legal right to stop or limit the directly infringing conduct, *as well as* the practical ability to do so." *Perfect 10, Inc.*, 508 F.3d at 1173-74 (emphasis added). In other words, *A&M* and *Fonovisa* came out the way they did because those defendants had the practical and legal ability to "*directly* put an end to [infringing] *conduct*." *Routt v. Amazon.com, Inc.*, 584 F. App'x 713, 714 (9th Cir. 2014) (emphasis added).

By contrast, the Ninth Circuit has repeatedly rejected vicarious liability where the infringement occurs not on the defendant's premises, but "on third-party websites." *Id.* at 715. In *Perfect 10, Inc. v. Amazon.com*, for example, the plaintiffs sought to hold Google liable for linking to infringing websites, noting that Google had the right to terminate advertising relationships with the infringers that were tied to the websites. 508 F.3d at 1173-75. The court rejected the claim because Google's mere exercise of the right to withhold its services would not "stop direct infringement by third-party websites." *Id.* at 1173-74. Similarly, in *Visa*, the defendant's exercise of a termination right might offer the "literal power to 'stop or limit' the infringement," but offered no "control over the actual infringing activity." *Visa*, 494 F.3d at 806. And in *VHT*, the Ninth Circuit held Zillow could not be vicariously liable under a "termination" theory because "[o]nce [infringing] photos were uploaded," they could not be clawed back, 918 F.3d at 746-47. *See Music Force, LLC v. Sony Music Holdings Inc.*, No. CV 19-6430, 2020 WL

5733258, at *3 (C.D. Cal. Aug. 12, 2020) ("[T]he right to terminate services or a contract with an infringer does not amount to a right and ability to supervise the infringing conduct" and there is no practical ability to stop infringement where "infringing content [could] simply appear[] elsewhere on the internet." (quotation marks omitted)).

The same is true here. Altice does not operate a premises. It provides nothing but a way to get to the countless digital premises in cyberspace that are controlled by others. As the Fifth Circuit and others have acknowledged, ISPs like Altice provide an agnostic, passive connection between points on an internet over which it has no dominion—it is the bus line that people take to the flea market, not the flea market itself. *BWP Media USA, Inc. v. T&S Software Assocs., Inc.*, 852 F.3d 436, 439, 442 (5th Cir. 2017); *CoStar*, 373 F.3d at 550-51.

Plaintiffs largely concede this as a factual matter. They acknowledge that infringement on P2P networks happens "widely" "on the Internet," not in some confined premises over which Altice exercises control. Compl. ¶¶ 89, 92. They further allege that infringement is "stunning in … scope," and available to "persons connected to the Internet" no matter who happens to provide their internet connection. *Id.* ¶ 90. And they nowhere suggest that by kicking subscribers off its service, Altice would prevent them or anyone else from possessing, downloading, or uploading songs, on their phones, at their local libraries, or at a coffee shop. So, even if Altice's right to terminate subscribers retroactively might indirectly limit some user conduct, that would not establish that Altice has the practical ability to stop infringement itself. This necessitates dismissal of the vicarious liability claim.

### B.    Plaintiffs do not adequately allege that Altice has a direct financial interest in infringement.

Independently, Plaintiffs fail to allege that Altice "profit[ed] *directly* from the infringement." *Grokster*, 545 U.S. at 930 n.9 (emphasis added).

**1.** Plaintiffs' first financial benefit theory is that "Altice has profited from illicit revenue through user subscription fees" that it would not have received had it terminated "repeat infringers." Compl. ¶ 121; *see id.* ¶ 104 ("Altice did not want to lose subscriber revenue by terminating accounts of infringing subscribers."). In other words, Plaintiffs point to the same flat monthly fees Altice receives from all its subscribers whether they infringe or not (as detailed in the terms of service Plaintiffs incorporate by reference at Compl. ¶ 86 & n.5), but insist that where those fees come from people who infringe, Altice receives a direct financial benefit from the infringement.

That theory is untenable. "Congress cautions courts that 'receiving a one-time set-up fee and flat periodic payments for service … [ordinarily] would not constitute receiving a financial benefit directly attributable to the infringing activity.'" *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (alteration in original). That is because ISPs like Altice receive the same fee whether someone uses their internet connection to infringe or not. If a user chooses not to infringe, as Altice would of course prefer, Altice would receive the same fee.

Plaintiffs cannot overcome the flat-fee rule by alleging that Altice would have "los[t] … revenue" had it terminated alleged infringers. Compl. ¶ 104. That is just another way of saying that Altice has a financial interest in, and benefits from, receiving subscription fees. It does not establish that Altice benefits "*from the infringement*." *Grokster*, 545 U.S. at 930 n.9 (emphasis added). To allege that Altice benefited from infringement itself, Plaintiffs would have to allege that Altice makes more profit when there is more infringement and less profit when there is less infringement. Under Plaintiffs' "blind eye" theory, Compl. ¶¶ 87, 104, 113, it makes no difference to Altice's bottom line if users infringe or not, so the theory cannot establish a direct financial benefit.

**2.** Plaintiffs' fallback argument is an attempt to plead a so-called "draw theory," an exception to the rule that receipt of a flat fee for service does not ordinarily suffice to show a direct financial benefit. That exception applies "where the value of the service lies in providing access to infringing materials." *Ellison*, 357 F.3d at 1079 (quotation marks omitted). In such circumstances, the ability to infringe the plaintiff's works serves as a "draw" to the defendant's service, which redounds to the defendant's bottom line. *Id.*; *see Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 673 (9th Cir. 2017). Adequately alleged, the draw rule satisfies the rule of thumb above—the more infringement there is, the more profit the defendant makes.

But the principle has a key limitation: Where "infringing activity constitutes … just an added benefit" to subscribers, it does not confer a direct financial benefit to the defendant. *Ellison*, 357 F.3d at 1079. In such circumstances, subscribers to the service might enjoy the added benefit of the ability to infringe, but they would still pay subscription fees whether they can infringe or not. To properly plead a draw theory, then, a plaintiff must plausibly allege not just that people like or wish to commit infringement, but that they *would not pay for service* if they could not infringe plaintiffs' works. Plaintiffs' theory fails that inquiry.

*First*, Plaintiffs allege that the "unlimited ability to download and distribute Plaintiffs' copyrighted works through Altice's service has served as a draw." Compl. ¶ 5; *see id.* ¶¶ 93, 121. That "formulaic recitation of the element[]" does not allege "factual content that allows the court to draw … reasonable inference[s]" that people subscribed to Altice's internet service because they wanted to infringe plaintiffs' works. *Iqbal*, 556 U.S. at 678. The very notion is implausible. People subscribe to the internet for the same reason they pay for electricity—internet service is essential to modern life in countless ways. Plaintiffs offer no reason to believe that there are people out there who want to use BitTorrent networks to infringe, but would dispense with the

internet if that were not an option. Indeed, Plaintiffs' own data shows that legitimate total internet traffic dwarfs BitTorrent traffic online. Compl. ¶ 92 n.8 (citing Sandvine, *Phenomena: The Global Internet Phenomena Report* 13 (2022)). Multiple district courts have thus rejected materially similar allegations at the motion to dismiss stage. *See UMG Recordings, Inc. v. Bright House Networks, LLC*, No. 19-cv-710, 2020 WL 3957675, at *5 (M.D. Fla. July 8, 2020); *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, No. 17-CV-365, 2018 WL 1096871, at *10 (W.D. Tex. Feb. 28, 2018).

*Second*, Plaintiffs allege that P2P downloads are faster on internet plans with higher data speeds, and "Altice is paid more when subscribers need higher data speeds." Compl. ¶¶ 78, 104; *see id.* ¶¶ 84, 88. They further allege that "in its consumer marketing material, … Altice…boasted about its high-speed Internet service directly to Internet users who download music." *Id.* ¶ 84. But Plaintiffs' own allegations refute the point. They assert, without reference to high-speed internet, that "BitTorrent is uniquely efficient" and any "persons connected to the Internet" can download songs "in the blink of an eye." Compl. ¶¶ 90-91. This forecloses any inference that Altice receives a direct financial benefit from higher-speed plans *because* subscribers choose them in order to infringe Plaintiffs' works (rather than for remote video conferences, to stream Netflix, or to legally download music). At most, Plaintiffs' allegation that would-be infringers like fast internet is "consistent with" their draw theory, *Iqbal*, 556 U.S. at 678 (quotation marks omitted), but does not *plausibly* allege that the ability to transfer a file slightly faster is the *cause* of anyone's decision to purchase a higher tier of Altice service.

As to allegations that Altice markets infringement for purposes of selling faster internet, Plaintiffs rely solely on a Suddenlink commercial uploaded to YouTube on November 18, 2015, Compl. ¶ 84 & n.2—predating the claim period in this case by more than 5 years, and predating

even the point at which Altice acquired Suddenlink, Compl. ¶ 80. That Plaintiffs' theory rests on a single commercial for a different company several years before the relevant conduct in this case commenced is telling indeed. As in *Bright House*, Plaintiffs' "'dog-whistle' theory that [Altice] advertises faster internet speeds to surreptitiously entice the prospective infringer" does not "plausibly allege[] that an internet thief would be 'drawn' by the efficiency of internet service any more than the average law-abiding purchaser of copyrighted content." 2020 WL 3957675, at *5.

Altice recognizes that the court in *Altice I* deemed similar allegations sufficient to state a claim by adopting "Plaintiffs' characterization of the case law discussing the 'draw' requirement." 2023 WL 3436089, at *5. Under that characterization, a draw exists any time infringement "enhance[s] the attractiveness" of a service. *Id.* (quoting, *inter alia*, *Fonovisa*, 76 F.3d at 263). This rule misunderstands the basis of vicarious liability and erases the critical causal link maintained by the distinction between a "draw" and "added benefit." As the Ninth Circuit has explained, if a defendant "had a … financial interest in every piece of content on [their service] that arguably made the [service] marginally more attractive …, then the requirement of a causal link would be erased." *Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 830 (9th Cir. 2019). Causation (or "draw") requires that the subscriber purchase the service "in order to" access infringing material. *Id.* Plaintiffs fail to allege this.

***

As *Twitter* explains, "generally … internet or cell service providers" do not "incur culpability merely for providing their services to the public writ large." 598 U.S. at 499. Under Plaintiffs' vicarious infringement theory, however, an ISP is liable for any conduct its users value, as long as it can terminate an internet connection when the user engages in it. A theory

that sweeping cannot be reconciled with long-standing limitations on secondary liability generally. And certainly it cannot be justified on the theory that Altice's subscribers or users are actually its agents, acting on its behalf, when they share files on the internet. The vicarious infringement claims should be dismissed.

## CONCLUSION

The Court should grant the motion to dismiss in its entirety.


Dated: January 29, 2024                                   Respectfully submitted,


                                                          By: */s/ Michael S. Elkin*

Wesley Hill                                               Michael S. Elkin*
State Bar No.: 24032294                                   Krishnan Padmanabhan*
WARD, SMITH & HILL, PLLC                                  Sean R. Anderson*
1507 Bill Owens Parkway                                   WINSTON & STRAWN LLP
Longview, TX 75604                                        200 Park Avenue
(903) 757-6400                                            New York, NY 10166
wh@wsfirm.com                                             (212) 294-6700
                                                          melkin@winston.com
Thomas M. Melsheimer                                      kpadmanabhan@winston.com
State Bar No.: 13922550                                   sranderson@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900                           Jennifer A. Golinveaux*
Dallas, TX 75201                                          WINSTON & STRAWN LLP
(314) 453-6500                                            101 California Street, 35th Floor
tmelsheimer@winston.com                                   San Francisco, CA 9411
                                                          (415) 591-1506
Sean H. Suber*                                            jgolinveaux@winston.com
WINSTON & STRAWN LLP
35 W. Wacker Dr.                                          Diana Leiden*
Chicago, IL 60601                                         WINSTON & STRAWN LLP
(312) 558-5600                                            333 South Grand Avenue, 38th Floor
ssuber@winston.com                                        Los Angeles, CA 90071
                                                          (213) 615-1700
Clement S. Roberts                                        dhleiden@winston.com
Orrick, Herrington & Sutcliffe LLP
405 Howard Street
San Francisco, CA 94105
(415) 773-5700
croberts@orrick.com

Christopher J. Cariello*
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000
ccariello@orrick.com

Mark S. Puzella*
Orrick, Herrington & Sutcliffe LLP
222 Berkeley Street, Suite 2000
Boston, MA 02116
(617) 880-1801
mpuzella@orrick.com

*Attorneys for Defendants Altice USA, Inc. and CSC Holdings, LLC*

*\*Pro Hac Vice*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have

consented to electronic service are being served with a copy of this document via the Court's

CM/ECF system per Local Rule CV-5(a)(3) on January 29, 2024

*/s/ Michael S. Elkin*
Michael S. Elkin