# Exhibit 11

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:  19-CV-874

**WARNER BROS. RECORDS INC., ATLANTIC RECORDING CORPORATION, BAD BOY RECORDS LLC, ELEKTRA ENTERTAINMENT GROUP INC., FUELED BY RAMEN LLC, NONESUCH RECORDS INC., ROADRUNNER RECORDS, INC., WEA INTERNATIONAL INC., WARNER/CHAPPELL MUSIC, INC., WARNER-TAMERLANE PUBLISHING CORP., WB MUSIC CORP., W.B.M. MUSIC CORP., UNICHAPPELL MUSIC INC., RIGHTSONG MUSIC INC., COTILLION MUSIC, INC., INTERSONG U.S.A., INC., SONY MUSIC ENTERTAINMENT, ARISTA MUSIC, ARISTA RECORDS LLC, LAFACE RECORDS LLC, PROVIDENT LABEL GROUP, LLC, SONY MUSIC ENTERTAINMENT US LATIN, VOLCANO ENTERTAINMENT III, LLC, ZOMBA RECORDINGS LLC, SONY/ATV MUSIC PUBLISHING LLC, EMI AL GALLICO MUSIC CORP., EMI ALGEE MUSIC CORP., EMI APRIL MUSIC INC., EMI BLACKWOOD MUSIC INC., COLGEMS-EMI MUSIC INC., EMI CONSORTIUM MUSIC PUBLISHING INC. D/B/A EMI FULL KEEL MUSIC, EMI CONSORTIUM SONGS, INC., INDIVIDUALLY AND D/B/A EMI LONGITUDE MUSIC, EMI ENTERTAINMENT WORLD INC. D/B/A EMI FORAY MUSIC, EMI JEMAXAL MUSIC INC., EMI FEIST CATALOG INC., EMI MILLER CATALOG INC., EMI MILLS MUSIC, INC., EMI UNART CATALOG INC., EMI U CATALOG INC., JOBETE MUSIC CO. INC., STONE AGATE MUSIC, SCREEN GEMS-EMI MUSIC INC., STONE DIAMOND MUSIC CORP., UMG RECORDINGS, INC., CAPITOL RECORDS, LLC, UNIVERSAL MUSIC CORP., UNIVERSAL MUSIC – MGB NA LLC, UNIVERSAL MUSIC PUBLISHING INC., UNIVERSAL MUSIC PUBLISHING AB, UNIVERSAL MUSIC PUBLISHING LIMITED, UNIVERSAL MUSIC PUBLISHING MGB LIMITED, UNIVERSAL MUSIC – Z TUNES LLC, ISLAND MUSIC LIMITED, POLYGRAM PUBLISHING, INC., AND SONGS OF UNIVERSAL, INC.**

      Plaintiffs,

  v.

**CHARTER COMMUNICATIONS, INC.**

      Defendant.

---

### COMPLAINT AND JURY DEMAND

---

Plaintiffs Warner Bros. Records Inc., Atlantic Recording Corporation, Bad Boy Records

LLC, Elektra Entertainment Group Inc., Fueled By Ramen LLC, Nonesuch Records Inc.,

Roadrunner Records, Inc., WEA International Inc., Warner/Chappell Music, Inc., Warner-Tamerlane Publishing Corp., WB Music Corp., W.B.M. Music Corp., Unichappell Music Inc., Rightsong Music Inc., Cotillion Music, Inc., and Intersong U.S.A., Inc. (collectively, the "Warner Plaintiffs"); and Plaintiffs Sony Music Entertainment, Arista Music, Arista Records LLC, LaFace Records LLC, Provident Label Group, LLC, Sony Music Entertainment US Latin, Volcano Entertainment III, LLC, and Zomba Recordings LLC (collectively, the "Sony Music Plaintiffs"); and Plaintiffs Sony/ATV Music Publishing LLC, EMI Al Gallico Music Corp., EMI Algee Music Corp., EMI April Music Inc., EMI Blackwood Music Inc., Colgems-EMI Music Inc., EMI Consortium Music Publishing Inc. d/b/a EMI Full Keel Music, EMI Consortium Songs, Inc., individually and d/b/a EMI Longitude Music, EMI Entertainment World Inc. d/b/a EMI Foray Music, EMI Jemaxal Music Inc., EMI Feist Catalog Inc., EMI Miller Catalog Inc., EMI Mills Music, Inc., EMI Unart Catalog Inc., EMI U Catalog Inc., Jobete Music Co. Inc., Stone Agate Music, Screen Gems-EMI Music Inc., and Stone Diamond Music Corp. (collectively, the "Sony/ATV and EMI Plaintiffs"); and UMG Recordings, Inc., Capitol Records, LLC, Universal Music Corp., Universal Music – MGB NA LLC, Universal Music Publishing Inc., Universal Music Publishing AB, Universal Music Publishing Limited, Universal Music Publishing MGB Limited, Universal Music – Z Tunes LLC, Island Music Limited, PolyGram Publishing, Inc., and Songs of Universal, Inc. (collectively, the "Universal Plaintiffs," and with the Warner Plaintiffs, Sony Music Plaintiffs, and Sony/ATV and EMI Plaintiffs, the "Plaintiffs"), for their Complaint against defendant Charter Communications, Inc. ("Charter" or "Defendant"), allege, on personal knowledge as to matters relating to themselves and on information and belief as to all other matters, as set forth below:

Case 1:19-cv-00874-MSK-MEH   Document 1   Filed 03/22/19   USDC Colorado   Page 3 of 27
Case 2:23-cv-00576-JRG-RSP   Document 26-20   Filed 01/29/24   Page 4 of 28 PageID #:
1161

## INTRODUCTION

1.     Plaintiffs are record companies that produce, manufacture, distribute, sell, and license commercial sound recordings, and music publishers that acquire, license, and otherwise exploit musical compositions, both in the United States and internationally.  Through their enormous investments of money, time, and exceptional creative efforts, Plaintiffs and their representative recording artists and songwriters have developed and marketed some of the world's most famous and popular music.  Plaintiffs own and/or control exclusive rights to the copyrights to some of the most famous sound recordings performed by classic artists and contemporary superstars, as well as the copyrights to large catalogs of iconic musical compositions and modern hit songs.  Their investments and creative efforts have shaped the musical landscape as we know it, both in the United States and around the world.

2.     Charter is one of the largest Internet service providers ("ISPs") in the country.  It markets and sells high-speed Internet services to consumers nationwide.  Through the provision of those services, Charter has knowingly contributed to, and reaped substantial profits from, massive copyright infringement committed by thousands of its subscribers, causing great harm to Plaintiffs, their recording artists and songwriters, and others whose livelihoods depend upon the lawful acquisition of music.  Charter's contribution to its subscribers' infringement is both willful and extensive, and renders Charter equally liable.  Indeed, for years, Charter deliberately refused to take reasonable measures to curb customers from using its Internet services to infringe on others' copyrights, including Plaintiffs' copyrights—even after Charter became aware of *particular customers* engaging in *specific, repeated acts* of infringement.  Plaintiffs' representatives (as well as others) sent hundreds of thousands of statutory infringement notices to Charter, under penalty of perjury.  Those notices advised Charter of its subscribers' blatant and systematic use of Charter's

Internet service to illegally download, copy, and distribute Plaintiffs' copyrighted music through BitTorrent and other online file-sharing services. Rather than working with Plaintiffs to curb this massive infringement, Charter did nothing, choosing to prioritize its own profits over its legal obligations.

3.     It is well-established law that a party may not assist someone it knows is engaging in copyright infringement. Further, when a party has a direct financial interest in the infringing activity, and the right and practical ability to stop or limit it, that party must act. Ignoring and flouting those basic responsibilities, Charter deliberately turned a blind eye to its subscribers' infringement. Charter failed to terminate or otherwise take meaningful action against the accounts of repeat infringers of which it was aware. Despite its professed commitment to taking action against repeat offenders, Charter routinely thumbed its nose at Plaintiffs by continuing to provide service to subscribers it knew to be serially infringing copyrighted sound recordings and musical compositions. In reality, Charter operated its service as an attractive tool and safe haven for infringement.

4.     Charter has derived an obvious and direct financial benefit from its customers' infringement. The unlimited ability to download and distribute Plaintiffs' works through Charter's service has served as a draw for Charter to attract, retain, and charge higher fees to subscribers. By failing to terminate the accounts of specific recidivist infringers known to Charter, Charter obtained a direct financial benefit from its subscribers' continuing infringing activity. That financial benefit included improper revenue that it would not have received had it appropriately shut down those accounts. Charter decided not to terminate infringers because it wanted to maintain the revenue that is generated from their accounts.

5.     The infringing activity of Charter's subscribers that is the subject of Plaintiffs'

claims, and for which Charter is secondarily liable, occurred *after* Charter received multiple notices of each subscriber's infringing activity.  Specifically, Plaintiffs seek relief for claims that accrued between March 24, 2013 and May 17, 2016 for infringement of works by Charter subscribers *after* those particular subscribers were identified to Charter in multiple infringement notices.[1]  These claims have been preserved through tolling agreements entered into with Charter in March, April, and June 2016, as applicable.

## NATURE OF ACTION

6.      This is a civil action in which Plaintiffs seek damages for copyright infringement under the Copyright Act, 17 U.S.C. § 101, *et seq.*

7.      This Court has original subject matter jurisdiction over Plaintiffs' copyright infringement claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

8.      This Court has personal jurisdiction over Charter pursuant to Colo. Rev. Stat. § 13-1-124.  Charter continuously and systematically transacts business in Colorado and maintains sizable operations in the state—employing thousands of people, and providing an array of services to customers, within the state.  In addition to its physical presence in the state, Charter has deliberately exploited the Colorado market, establishing significant network management operations in this district, selling its services to over 100,000 Colorado customers, and advertising its "blazing-fast Internet speeds" to potential subscribers in the state.

9.      Moreover, Charter has engaged in substantial activities purposefully directed at Colorado from which Plaintiffs' claims arise, including providing Internet service to Colorado

---

[1] Specifically, the Universal Plaintiffs seek relief for claims that accrued on or after March 24, 2013; the Sony Music Plaintiffs and Warner Plaintiffs seek relief for claims that accrued on or after April 18, 2013; and the Sony/ATV and EMI Plaintiffs seek relief for claims that accrued on or after June 15, 2013.

subscribers who used Charter's network to directly and repeatedly infringe Plaintiffs' copyrights; continuing to provide Internet service to, and failing to suspend or terminate the accounts of, Colorado customers, even after receiving multiple notices of their infringing activity; advertising its high-speed Internet services in Colorado to serve as a draw for subscribers who sought faster download speeds to facilitate their direct and repeated infringements; employing individuals within Colorado with responsibility for overseeing its network and subscriber use policies; and/or responding or failing to respond to repeated notices of copyright infringement directed to infringing subscribers located in the state.

10.     Much of the misconduct alleged in this Complaint arises directly from Charter's forum-directed activities—specifically, repeated acts of infringement by specific subscribers using Charter's network; Charter's awareness of those activities; Charter's receipt of and failure to act in response to Plaintiffs' notices of infringement; and Charter's failure to take reasonable measures to terminate repeat infringers.

11.     Many of the acts complained of herein occurred in Colorado and in this judicial district.  For example, a number of egregious repeat infringers who are Charter subscribers reside in and infringed Plaintiffs' rights in Colorado and this judicial district, using Internet service provided by Charter in the state.   Indeed, Plaintiffs have identified over a hundred Charter subscribers who appear to reside in Colorado and who have repeatedly infringed Plaintiffs' copyrighted works.  For example, one Charter subscriber believed to be located in Grand Junction, Colorado, with the IP address 72.175.144.149 at the time of the infringing conduct, was identified in infringement notices 63 times between June 26, 2014 and September 28, 2014.  Another Charter subscriber believed to be located in Grand Junction, Colorado, with the IP address 98.127.105.135 at the time of infringement, was identified in infringement notices 54 times between May 29, 2014

and March 29, 2015.  Yet another Charter subscriber believed to be located in Montrose, Colorado, with the IP address 184.167.217.19 at the time of infringement, was identified in infringement notices 53 times between September 11, 2014 and January 12, 2015.  Still another Charter subscriber believed to be located in Canon City, Colorado, with the IP address 72.174.161.193 at the time of infringement, was identified in infringement notices 50 times between October 1, 2014 and March 29, 2015.

12.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c), and 1400(a).  A substantial part of the acts of infringement, and other events and omissions complained of herein, occur or have occurred in this district, and this is a district in which Charter resides or may be found.

## PLAINTIFFS AND THEIR COPYRIGHTED MUSIC

13.     Plaintiffs are the copyright owners of, and/or control exclusive rights with respect to, millions of sound recordings (*i.e.*, recorded music) and/or musical compositions (*i.e.*, the songs embodied in sound recordings), including by some of the most prolific and well-known songwriters and recording artists throughout the world.

14.     Plaintiff Warner Bros. Records Inc. ("WBR") is a Delaware corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

15.     Plaintiff Atlantic Recording Corporation ("Atlantic") is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

16.     Plaintiff Bad Boy Records LLC ("Bad Boy") is a Delaware Limited Liability Company with its principal place of business at 1633 Broadway, New York, New York 10019.

17.     Plaintiff Elektra Entertainment Group Inc. ("Elektra") is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

18.     Plaintiff Fueled By Ramen LLC ("FBR") is a Delaware Limited Liability Company with its principal place of business at 1633 Broadway, New York, New York 10019.

19.     Plaintiff Nonesuch Records Inc. ("Nonesuch") is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

20.     Plaintiff Roadrunner Records, Inc. ("Roadrunner") is a New York corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

21.     Plaintiff WEA International Inc. ("WEA") is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

22.     Plaintiff Sony Music Entertainment ("Sony") is a Delaware general partnership, the partners of which are citizens of New York and Delaware.  Sony's headquarters and principal place of business are located at 25 Madison Avenue, New York, New York 10010.

23.     Plaintiff Arista Music ("Arista Music") is a New York partnership with its principal place of business at 25 Madison Avenue, New York, New York 10010.

24.     Plaintiff Arista Records LLC ("Arista Records") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

25.     Plaintiff LaFace Records LLC ("LaFace") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

26.     Plaintiff Provident Label Group, LLC ("Provident") is a Delaware Limited Liability Company with its principal place of business at 741 Cool Springs Boulevard, Franklin, Tennessee 37067.

27.     Plaintiff Sony Music Entertainment US Latin ("Sony Latin") is a Delaware Limited Liability Company with its principal place of business at 3390 Mary Street, Suite 220, Coconut Grove, Florida 33133.

Case 1:19-cv-00874-MSK-MEH   Document 1   Filed 03/22/19   USDC Colorado   Page 9 of 27
Case 2:23-cv-00576-JRG-RSP   Document 26-20   Filed 01/29/24   Page 10 of 28 PageID #:
1167

28.     Plaintiff Volcano Entertainment III, LLC ("Volcano") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

29.     Plaintiff Zomba Recording LLC ("Zomba") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

30.     Plaintiff UMG Recordings, Inc. ("UMG") is a Delaware corporation with its principal place of business at 2220 Colorado Avenue, Santa Monica, California 90404.

31.     Plaintiff Capitol Records, LLC ("Capitol Records") is Delaware Limited Liability Company with its principal place of business at 1750 N. Vine Street, Los Angeles, California 90068.

32.     Plaintiffs WBR, Atlantic, Bad Boy, Elektra, FBR, Nonesuch, Roadrunner, WEA, Sony, Arista Music, Arista Records, LaFace, Provident, Sony Latin, Volcano, Zomba, UMG, and Capitol Records are referred to herein collectively as the "Record Company Plaintiffs."

33.     The Record Company Plaintiffs are some of the largest record companies in the world, engaged in the business of producing, manufacturing, distributing, selling, licensing, and otherwise exploiting sound recordings in the United States through various media.  They invest substantial money, time, effort, and talent in creating, advertising, promoting, selling, and licensing unique and valuable sound recordings embodying the performances of their exclusive recording artists.

34.     Plaintiff Warner/Chappell Music, Inc. ("Warner/Chappell") is a Delaware corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

35.     Plaintiff Warner-Tamerlane Publishing Corp. ("Warner-Tamerlane") is a

Case 1:19-cv-00874-MSK-MEH   Document 1   Filed 03/22/19   USDC Colorado   Page 10 of 27
Case 2:23-cv-00576-JRG-RSP   Document 26-20   Filed 01/29/24   Page 11 of 28 PageID #:
1168

California corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

36.     Plaintiff WB Music Corp. ("WB Music") is a California corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

37.     Plaintiff W.B.M. Music Corp. ("W.B.M.") is a Delaware corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

38.     Plaintiff Unichappell Music Inc. ("Unichappell") is a Delaware corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

39.     Plaintiff Rightsong Music Inc. ("Rightsong Music") is a Delaware corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

40.     Plaintiff Cotillion Music, Inc. ("Cotillion") is a Delaware corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

41.     Plaintiff Intersong U.S.A., Inc. ("Intersong") is a Delaware corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

42.     Plaintiff Sony/ATV Music Publishing LLC ("Sony/ATV") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

43.     Plaintiff EMI Al Gallico Music Corp. ("EMI Al Gallico"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

44.     Plaintiff EMI Algee Music Corp. ("EMI Algee"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Case 1:19-cv-00874-MSK-MEH   Document 1   Filed 03/22/19   USDC Colorado   Page 11 of 27
Case 2:23-cv-00576-JRG-RSP   Document 26-20   Filed 01/29/24   Page 12 of 28 PageID #:
1169

45.     Plaintiff EMI April Music Inc. ("EMI April"), an affiliate of Sony/ATV, is a Connecticut corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

46.     Plaintiff EMI Blackwood Music Inc. ("EMI Blackwood"), an affiliate of Sony/ATV, is a Connecticut corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

47.     Plaintiff Colgems-EMI Music Inc. ("EMI Colgems"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

48.     Plaintiff EMI Consortium Music Publishing Inc. d/b/a EMI Full Keel Music ("EMI Full Keel"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

49.     Plaintiff EMI Consortium Songs, Inc., individually and d/b/a EMI Longitude Music ("EMI Longitude"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

50.     EMI Entertainment World Inc. d/b/a EMI Foray Music ("EMI Entertainment"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

51.     EMI Jemaxal Music Inc. ("EMI Jemaxal"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

52.     Plaintiff EMI Feist Catalog Inc. ("EMI Feist"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 25 Madison Avenue, New York, New York

10010.

53.     Plaintiff EMI Miller Catalog Inc. ("EMI Miller"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

54.     Plaintiff EMI Mills Music, Inc. ("EMI Mills"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

55.     Plaintiff EMI Unart Catalog Inc. ("EMI Unart"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

56.     Plaintiff EMI U Catalog Inc. ("EMI U"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

57.     Plaintiff Jobete Music Co. Inc. ("Jobete"), an affiliate of Sony/ATV, is a Michigan corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.  Plaintiff Stone Agate Music ("Stone Agate") is a division of Jobete.

58.     Plaintiff Screen Gems-EMI Music Inc. ("Gems-EMI"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

59.     Plaintiff Stone Diamond Music Corp. ("Stone"), an affiliate of Sony/ATV, is a Michigan corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

60.     Plaintiff Universal Music Corp. ("UMC") is a California corporation with its

principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

61.     Plaintiff Universal Music – MGB NA LLC ("MGB") is a California Limited Liability Company with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

62.     Plaintiff Universal Music Publishing Inc. ("Universal Music Publishing") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

63.     Plaintiff Universal Music Publishing AB ("AB") is a company organized under the laws of Sweden.

64.     Plaintiff Universal Music Publishing Limited ("Publishing Limited") is a company incorporated under the laws of England and Wales.

65.     Plaintiff Universal Music Publishing MGB Limited ("MGB Limited") is a company incorporated under the laws of England and Wales.

66.     Plaintiff Universal Music – Z Tunes LLC ("Z Tunes") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

67.     Plaintiff Island Music Limited ("Island") is a company incorporated under the laws of England and Wales.

68.     Plaintiff Polygram Publishing, Inc. ("Polygram Publishing") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

69.     Plaintiff Songs of Universal, Inc. ("Songs of Universal") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

70.     Plaintiffs Warner/Chappell, Warner-Tamerlane, WB Music, W.B.M., Unichappell,

Rightsong Music, Cotillion, Intersong, Sony/ATV, EMI Al Gallico, EMI Algee, EMI April, EMI Blackwood, EMI Colgems, EMI Full Keel, EMI Longitude, EMI Entertainment, EMI Jemaxal, EMI Feist, EMI Miller, EMI Mills, EMI Unart, EMI U, Jobete, Stone Agate, Gems-EMI, Stone, UMC, MGB, Universal Music Publishing, AB, Publishing Limited, MGB Limited, Z Tunes, Island, Polygram Publishing, and Songs of Universal are referred to herein collectively as the "Music Publisher Plaintiffs."

71.     The Music Publisher Plaintiffs are leading music publishers engaged in the business of acquiring, owning, publishing, licensing, and otherwise exploiting copyrighted musical compositions.  Each invests substantial money, time, effort, and talent to acquire, administer, publish, license, and otherwise exploit such copyrights, on its own behalf and on behalf of songwriters and others who have assigned exclusive copyright interests to the Music Publisher Plaintiffs.

72.     Plaintiffs own and/or control in whole or in part the copyrights and/or exclusive rights in innumerable popular sound recordings and musical compositions, including the sound recordings listed on Exhibit A and musical compositions listed on Exhibit B, both of which are illustrative and non-exhaustive.  All of the sound recordings and musical compositions listed on Exhibits A and B have been registered with the U.S. Copyright Office.

## CHARTER AND ITS ACTIVITIES

73.     Defendant Charter Communications, Inc. is a Delaware corporation, with its principal place of business at 400 Atlantic Street, Stamford, Connecticut 06901.  Charter also maintains substantial operations and offices in Colorado, including in Greenwood Village, Colorado.

74.     Charter is one of the largest ISPs in the country.  In 2015, Charter had more than 5

million subscribers and today has more than 22 million subscribers.  At all pertinent times, Charter's customers, including those in Colorado, have paid substantial subscription fees for access to its high-speed Internet network, with Charter offering a tiered pricing structure whereby a subscriber can have even higher downloading speeds for a higher monthly fee.

75.     Many of Charter's customers are motivated to subscribe to Charter's service because it allows them to download music and other copyrighted content—including unauthorized content—as efficiently as possible.  Accordingly, in its consumer marketing material, including material directed to Colorado customers, Charter has touted how its service enables subscribers to download and upload large amounts of content at "blazing-fast Internet speeds."  Charter has told existing and prospective customers that its high-speed service enables subscribers to "download just about anything instantly," and subscribers have the ability to "download 8 songs in 3 seconds." Charter has further told subscribers that its Internet service "has the speed you need for everything you do online."  In exchange for this service, Charter has charged its customers monthly fees ranging in price based on the speed of service.

76.     At the same time, Charter has consistently and actively engaged in network management practices to suit its own purposes.  This includes monitoring for, and taking action against, spam and other unwanted activity that might otherwise interfere with its provision of Internet service to its subscribers.  But Charter has gone out of its way *not* to take action against subscribers engaging in repeated copyright infringement, for its own financial benefit and at the expense of the underlying owners and controllers of copyright interests, including Plaintiffs, ultimately forcing Plaintiffs to bring this litigation.

77.     At all pertinent times, Charter knew that its subscribers routinely used its networks for illegally downloading and uploading copyrighted works, especially music.  As described

Case 1:19-cv-00874-MSK-MEH   Document 1   Filed 03/22/19   USDC Colorado   Page 16 of 27
Case 2:23-cv-00576-JRG-RSP   Document 26-20   Filed 01/29/24   Page 17 of 28 PageID #:
1174

below, Plaintiffs repeatedly notified Charter that many of its subscribers were actively utilizing its service to infringe their works. Those notices gave Charter the specific identities of its infringing subscribers, referred to by their unique Internet Protocol (or "IP") addresses. Yet Charter persistently turned a blind eye to the massive infringement of Plaintiffs' works occurring over its network. Charter condoned the illegal activity because it was popular with subscribers and acted as a draw to attract and retain new and existing subscribers. Charter's customers, in turn, purchased more bandwidth and continued using Charter's services to infringe Plaintiffs' copyrights. Charter undoubtedly recognized that if it terminated or otherwise prevented repeat infringer subscribers from using its service to infringe, or made it less attractive for such use, Charter would enroll fewer new subscribers, lose existing subscribers, and ultimately lose revenue. For those account holders and subscribers who wanted to download files illegally at faster speeds, Charter obliged them in exchange for higher rates. In other words, the greater the bandwidth its subscribers required for pirating content, the more money Charter made.

## THE GLOBAL P2P PIRACY PROBLEM

### General Landscape

78.     While the digital age has brought many benefits, one notable exception is its facilitation of unprecedented online piracy of music and other copyrighted works. As the Supreme Court has recognized, the level of copyright infringement on the Internet is "staggering." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 923 (2005).

79.     Use of peer-to-peer ("P2P") distribution systems has dominated unauthorized downloading and distribution of copyrighted music. P2P is a generic term used to refer to a decentralized network of users whereby each Internet-connected participant (*i.e.*, a "peer" or a "node") can act as both a supplier and consumer of content files. Early P2P services, such as

Case 1:19-cv-00874-MSK-MEH   Document 1   Filed 03/22/19   USDC Colorado   Page 17 of 27
Case 2:23-cv-00576-JRG-RSP   Document 26-20   Filed 01/29/24   Page 18 of 28 PageID #:
1175

Napster and KaZaA, have been replaced by even more robust and efficient systems, most notably a protocol called "BitTorrent." The online piracy committed via BitTorrent is stunning in nature, speed, and scope. Utilizing a BitTorrent client—essentially a tool that manages the uploading and downloading of files through BitTorrent technology—persons connected to the Internet can locate, access, and download copyrighted content from other peers in the blink of an eye. They download copyrighted music from other network users, usually total strangers, and end up with complete digital copies of any music they desire—including entire catalogues of music—without payment to copyright owners or creators.

80.     BitTorrent is uniquely efficient in the way it facilitates illegal file transfers. On earlier P2P networks, a user wanting to download a music file would have to locate another Internet-connected peer with the desired file and download the entire file from that peer. BitTorrent facilitates much faster downloading by breaking each file into pieces, allowing users to download different pieces of content simultaneously from different peers. At the same time, the system allows users to begin disseminating the copyrighted content before the complete file has even downloaded. This means that, at any given time, each user connected to the Internet can be both downloading and uploading different pieces of a file from, and to, multiple other users. Once a user has downloaded all the pieces, the file is automatically reassembled into its complete form and available for playback by the user. Needless to say, acquiring copyrighted music in this fashion eliminates the need to obtain it through legitimate channels and eliminates the requirement of paying a fee.

81.     Not surprisingly, then, during the time period in which the claims in this action arose, BitTorrent was used widely as a vehicle to infringe content online. In a report from January 2011, a survey conducted by the firm Envisional estimated that 11.4 percent of all Internet traffic

involved the unauthorized distribution of non-pornographic copyrighted content via BitTorrent. In a report from September 24, 2013, another company, NetNames, estimated that 99.97 percent of non-pornographic files distributed via BitTorrent systems infringe copyrights. To illustrate, in one well-publicized incident in 2015, millions of individual BitTorrent users downloaded an episode of HBO's "Game of Thrones" within just 24 hours of its airing.

### Plaintiffs' Enforcement Activities and Charter's Efforts to Thwart Them

82.     Over the past two decades, as P2P piracy became widespread, music and other copyright owners have employed litigation and other means to attempt to curtail the massive theft of their copyrighted works. Charter has been keenly aware of those efforts and the use of its network for P2P piracy, including the specific identities of subscribers using its network to infringe Plaintiffs' works.

83.     Indeed, Charter knew subscribers were using its network for such infringing activities as early as 2003. A number of record companies, including some of the Record Company Plaintiffs, initiated a multi-year effort to enforce their copyrights against persons using P2P systems to infringe copyrighted musical works directly. Because the copyright holders could only determine the unique IP addresses of an ISP's infringing subscribers, but not their actual identities, they served subpoenas on Charter and other ISPs to obtain the infringing subscribers' names and contact information. Although Charter's customer agreements allowed it to produce that information, and no real doubt existed as to their customers' underlying infringement, Charter vigorously opposed the subpoenas, undermining the record companies' efforts to curb direct infringement activity.

84.     As a result, the record companies were forced to pursue the slower and more expensive process of filing "John Doe" lawsuits to ascertain the infringers' identities. In those

litigations, Charter was required to provide identifying information about infringing subscribers. As Charter is aware, many of those cases resulted in judgments confirming its subscribers' liability for copyright infringement through Charter's Internet service, including infringement of works owned or exclusively controlled by Plaintiffs.

85.     Thereafter, the Record Company Plaintiffs began sending notices to Charter (and other ISPs) identifying additional specific instances of its subscribers' infringement through P2P activities. From 2012 through 2015, Charter received *hundreds of thousands of notices*, provided under penalty of perjury, detailing specific instances of its subscribers using P2P protocols on its network to distribute and copy Plaintiffs' copyrighted content unlawfully both within, and beyond, the Charter network.

86.     The infringement notices provided to Charter identify the unique IP address assigned to each user of Charter's network, and the date and time the infringing activity was detected. Only Charter, as the provider of the technology and system used to infringe, had the information required to match the IP address to a particular subscriber, and to contact that subscriber or terminate that subscriber's service.

87.     Plaintiffs' infringement notices notified Charter of clear and unambiguous infringing activity by Charter subscribers—that is, unauthorized downloading and distribution of copyrighted music. Charter's subscribers had no legal basis or justification for downloading or distributing digital copies of Plaintiffs' sound recordings and musical compositions to thousands or millions of strangers over the Internet. Tellingly, to the extent that Charter forwarded Plaintiffs' infringement notices to subscribers accused of using Charter's network to infringe, those subscribers did not challenge the claims of infringement by sending counter-notices to Charter contesting those claims (a process that Charter outlined and made available to its users).

88.     Apart from attesting to the sheer volume of the infringing activity on its network, the infringement notices sent to Charter pointed to specific subscribers who were flagrant and serial infringers.  The infringement notices identified tens of thousands of Charter subscribers engaged in blatant and repeated infringement of Plaintiffs' copyrighted works.  To cite just a few specific examples:

- During a 623-day period, Charter's subscriber with IP address 66.189.102.119 was identified in 220 infringement notices, which were sent on at least 184 separate days.

- During a 395-day period, Charter's subscriber with IP address 71.85.202.236 was identified in 206 infringement notices, which were sent on at least 138 separate days.

- During a 547-day period, Charter's subscriber with IP address 68.187.189.36 was identified in 197 infringement notices, which were sent on at least 157 separate days.

- During a 363-day period, Charter's subscriber with IP address 75.130.165.208 was identified in 189 infringement notices, which were sent on at least 123 separate days.

- During a 393-day period, Charter's subscriber with IP address 24.159.16.82 was identified in 174 infringement notices, which were sent on at least 134 separate days.

- During a 304-day period, Charter's subscriber with IP address 98.127.105.135 was identified in 54 infringement notices, which were sent on at least 53 separate days.

These examples and countless others amply illustrate that, rather than terminating repeat infringers—and losing subscription revenues—Charter simply looked the other way.

89.     During all pertinent times, Charter had the full legal right, obligation, and technical ability to prevent or limit the infringements occurring on its network.  Under Charter's "Terms of Service/Policies," which its subscribers agreed to as a condition of using its Internet service, Charter was empowered to exercise its right and ability to suspend or terminate a customer's Internet access.  Charter could do so for a variety of reasons, including a subscriber's copyright

Case 1:19-cv-00874-MSK-MEH   Document 1   Filed 03/22/19   USDC Colorado   Page 21 of 27
Case 2:23-cv-00576-JRG-RSP   Document 26-20   Filed 01/29/24   Page 22 of 28 PageID #:
1179

infringement activity.  Charter's Copyright Policy expressly provided that "[i]f Charter receives more than *one* Notice of Copyright Infringement on the customer's part, the customer may be deemed a 'repeat copyright infringer . . . [and Charter] reserves the right to terminate the accounts of 'repeat copyright infringers.'"  (Emphasis added.)

90.    Despite these alleged policies, and despite receiving hundreds of thousands of infringement notices from Plaintiffs, as well as thousands of similar notices from other copyright owners, Charter knowingly permitted specifically identified repeat infringers to continue to use its network to infringe.  Rather than disconnect the Internet access of blatant repeat infringers to curtail their infringement, Charter knowingly continued to provide these subscribers with the Internet access that enabled them to continue to illegally download or distribute Plaintiffs' copyrighted works unabated.  Charter's provision of high-speed Internet service to known infringers materially contributed to these direct infringements.

91.    Charter's motivation for refusing to terminate or suspend the accounts of blatant infringing subscribers is simple:  it valued corporate profits over its legal responsibilities.  Charter did not want to lose subscriber revenue by terminating accounts of infringing subscribers. Retaining infringing subscribers provided a direct financial benefit to Charter.  Nor did Charter want to risk the possibility that account terminations would make its service less attractive to other existing or prospective users.  Moreover, Charter was simply disinterested in devoting sufficient resources to tracking repeat infringers, responding to infringement notices, and terminating accounts in appropriate circumstances.  Considering only its own pecuniary gain, Charter ignored and turned a blind eye to flagrant, repeat violations by known specific subscribers using its service to infringe, thus facilitating and multiplying the harm to Plaintiffs.  And Charter's failure to police its infringing subscribers adequately was a draw to subscribers to purchase Charter's services, so

Case 1:19-cv-00874-MSK-MEH   Document 1   Filed 03/22/19   USDC Colorado   Page 22 of 27
Case 2:23-cv-00576-JRG-RSP   Document 26-20   Filed 01/29/24   Page 23 of 28 PageID #:
1180

that the subscribers could then use those services to infringe Plaintiffs' (and others') copyrights. The specific infringing subscribers identified in Plaintiffs' notices, including the egregious infringers identified herein, knew Charter would not terminate their accounts despite receiving multiple notices identifying them as infringers, and they remained Charter subscribers to continue illegally downloading copyrighted works.

92. The consequences of Charter's support of and profit from infringement are obvious and stark. When Charter's subscribers use Charter's network to obtain infringing copies of Plaintiffs' copyrighted works illegally, that activity undercuts the legitimate music market, depriving Plaintiffs and those recording artists and songwriters whose works they sell and license of the compensation to which they are entitled. Without such compensation, Plaintiffs, and their recording artists and songwriters, have fewer resources available to invest in the further creation and distribution of high-quality music.

## CLAIMS FOR RELIEF

### Count I – Contributory Copyright Infringement

93. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 92 as if fully set forth herein.

94. Charter and its subscribers do not have any authorization, permission, license, or consent to exploit the copyrighted sound recordings or musical compositions at issue.

95. Charter's subscribers, using Internet access and services provided by Charter, have unlawfully reproduced and distributed via BitTorrent, or other P2P networks, thousands of sound recordings and musical compositions for which Plaintiffs are the legal or beneficial copyright owners or exclusive licensees. The copyrighted works infringed by Charter's subscribers, which have been registered with the U.S. Copyright Office, include those listed on Exhibits A and B, and

many others.  The foregoing activity constitutes direct infringement in violation of 17 U.S.C. §§ 106 and 501, *et seq.*

96.     Charter is liable as a contributory copyright infringer for the direct infringements described above.  Through Plaintiffs' infringement notices and other means, Charter had knowledge that its network was being used for infringement of Plaintiffs' copyrighted works on a massive scale, and also knew of specific subscribers engaged in such repeated and flagrant infringement.  Nevertheless, Charter facilitated, encouraged, and materially contributed to such infringement by continuing to provide its network and the facilities necessary for its subscribers to commit repeated infringements.  Charter had the means to withhold that assistance upon learning of specific infringing activity by specific users but failed to do so.

97.     By purposefully ignoring and turning a blind eye to its subscribers' flagrant and repeated infringements, Charter knowingly caused and materially contributed to the unlawful reproduction and distribution of Plaintiffs' copyrighted works, including but not limited to those listed on Exhibits A and B hereto, in violation of Plaintiffs' exclusive rights under the copyright laws of the United States.

98.     Each infringement of Plaintiffs' copyrighted sound recordings and musical compositions constitutes a separate and distinct act of infringement.  Plaintiffs' claims of infringement against Charter are timely pursuant to tolling agreements.

99.     The foregoing acts of infringement by Charter have been willful, intentional, and purposeful, in blatant disregard of Plaintiffs' rights.  Indeed, the sound recordings on Exhibit A and the musical compositions on Exhibit B represent works infringed by Charter's subscribers *after* those particular subscribers were identified to Charter in multiple infringement notices.

100.    As a direct and proximate result of Charter's willful infringement of Plaintiffs'

Case 1:19-cv-00874-MSK-MEH   Document 1   Filed 03/22/19   USDC Colorado   Page 24 of 27
Case 2:23-cv-00576-JRG-RSP   Document 26-20   Filed 01/29/24   Page 25 of 28 PageID #:
1182

copyrights, Plaintiffs are entitled to statutory damages pursuant to 17 U.S.C. § 504(c), in an amount

of up to $150,000 with respect to each work infringed, or such other amount as may be proper

under 17 U.S.C. § 504(c).  Alternatively, at Plaintiffs' election, Plaintiffs shall be entitled to their

actual damages pursuant to 17 U.S.C. § 504(b), including Charter's profits from the infringements,

as will be proven at trial.

101.    Plaintiffs also are entitled to their attorneys' fees and full costs pursuant to 17

U.S.C. § 505.

<u>**Count II – Vicarious Copyright Infringement**</u>

102.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1

through 101 as if fully set forth herein.

103.    Charter and its subscribers have no authorization, license, or other consent to

exploit the copyrighted sound recordings or musical compositions at issue.

104.    Charter's subscribers, using Internet access and services provided by Charter, have

unlawfully reproduced and distributed via BitTorrent or other P2P services thousands of sound

recordings and musical compositions of which Plaintiffs are the legal or beneficial copyright

owners or exclusive licensees.  The copyrighted works infringed by Charter's subscribers, which

have been registered with the U.S. Copyright Office, include those listed on Exhibits A and B, and

many others.  The foregoing activity constitutes direct infringement in violation of 17 U.S.C. §§

106 and 501, *et seq.*

105.    Charter is liable as a vicarious copyright infringer for the direct infringements

described above.  Charter has the legal and practical right and ability to supervise and control the

infringing activities that occur through the use of its network, and at all relevant times has had a

financial interest in, and derived direct financial benefit from, the infringing use of its network.

Case 1:19-cv-00874-MSK-MEH   Document 1   Filed 03/22/19   USDC Colorado   Page 25 of 27
Case 2:23-cv-00576-JRG-RSP   Document 26-20   Filed 01/29/24   Page 26 of 28 PageID #:
1183

Charter has derived an obvious and direct financial benefit from its customers' infringement.  The ability to use Charter's high-speed Internet facilities to illegally download Plaintiffs' copyrighted works has served to draw, maintain, and generate higher fees from paying subscribers to Charter's service.  Among other financial benefits, by failing to terminate the accounts of specific repeat infringers known to Charter, Charter has profited from illicit revenue through user subscription fees that it would not have otherwise received from repeat infringers, as well as new subscribers drawn to Charter's services for the purpose of illegally downloading copyrighted works.  The specific infringing subscribers identified in Plaintiffs' notices, including the egregious infringers identified herein, knew Charter would not terminate their accounts despite receiving multiple notices identifying them as infringers, and they remained Charter subscribers to continue illegally downloading copyrighted works.

106.    Charter is vicariously liable for the unlawful reproduction and distribution of Plaintiffs' copyrighted works, including but not limited to those listed on Exhibits A and B hereto, in violation of Plaintiffs' exclusive rights under the copyright laws of the United States.

107.    Each infringement of Plaintiffs' copyrighted sound recordings and musical compositions constitutes a separate and distinct act of infringement.  Plaintiffs' claims of infringement against Charter are timely pursuant to tolling agreements.

108.    The foregoing acts of infringement by Charter have been willful, intentional, and purposeful, in blatant disregard of Plaintiffs' rights.  Indeed, the sound recordings on Exhibit A and the musical compositions on Exhibit B are works infringed by Charter's subscribers *after* those particular subscribers were identified to Charter in multiple prior infringement notices.

109.    As a direct and proximate result of Charter's willful infringement of Plaintiffs' copyrights, Plaintiffs are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in an

amount of up to $150,000 with respect to each work infringed, or such other amount as may be proper under 17 U.S.C. § 504(c).  Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their actual damages, including Charter's profits from the infringements, as will be proven at trial.

110.    Plaintiffs are further entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment from this Court against Charter as follows:

a.  For a declaration that Charter willfully infringed Plaintiffs' copyrights;

b.  For statutory damages pursuant to 17 U.S.C. § 504(c), in an amount up to the maximum provided by law, arising from Charter's willful violations of Plaintiffs' rights under the Copyright Act; or, in the alternative, at Plaintiffs' election, Plaintiffs' actual damages pursuant to 17 U.S.C. § 504(b), including Charter's profits from infringement, in an amount to be proven at trial;

c.  For an award of Plaintiffs' costs in this action, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505;

d.  For pre-judgment and post-judgment interest at the applicable rate on any monetary award made part of the judgment against Charter; and

e.  For such other and further relief as the Court deems proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury of all issues that are so triable.

Case 1:19-cv-00874-MSK-MEH   Document 1   Filed 03/22/19   USDC Colorado   Page 27 of 27
Case 2:23-cv-00576-JRG-RSP   Document 26-20   Filed 01/29/24   Page 28 of 28 PageID #:
1185

Dated:  March 22, 2019                     Respectfully submitted,

                                           */s/ Janette L. Ferguson*
                                           Janette L. Ferguson, Esq.
                                           Benjamin M. Leoni, Esq.
                                           LEWIS BESS WILLIAMS & WEESE, P.C.
                                           1801 California Street, Suite 3400
                                           Denver, CO 80202
                                           Tel: (303) 861-2828
                                           Facsimile: (303) 861-4017
                                           jferguson@lewisbess.com
                                           bleoni@lewisbess.com

                                           Matthew J. Oppenheim
                                           Scott A. Zebrak
                                           Jeffrey M. Gould
                                           Kerry M. Mustico
                                           OPPENHEIM + ZEBRAK, LLP
                                           4530 Wisconsin Ave. NW, 5th Floor
                                           Washington, DC 20016
                                           Tel: (202) 621-9027
                                           matt@oandzlaw.com
                                           scott@oandzlaw.com
                                           jeff@oandzlaw.com
                                           kerry@oandzlaw.com

                                           Mitchell A. Kamin
                                           Neema T. Sahni (*admission pending*)
                                           Rebecca Van Tassell
                                           COVINGTON & BURLING LLP
                                           1999 Avenue of the Stars, Suite 3500
                                           Los Angeles, CA 90067-4643
                                           Telephone: (424) 332-4800
                                           mkamin@cov.com
                                           nsahni@cov.com
                                           rvantassell@cov.com

                                           Jonathan M. Sperling (*admission pending*)
                                           Jacqueline C. Charlesworth (*admission pending*)
                                           COVINGTON & BURLING LLP
                                           The New York Times Building
                                           620 Eighth Avenue
                                           New York, NY 10018-1405
                                           Telephone: (212) 841-1000
                                           jsperling@cov.com
                                           jcharlesworth@cov.com

                                           *Attorneys for Plaintiffs*